# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RUSSELL COLE, an individual; and
STEPHANIE OBERG, an individual,
          Plaintiffs,
     vs.                                No. C-08-05017 PVT
CITY OF SUNNYVALE, a  municipal
corporation within the State of
California; BUREAU OF POLICE CHIEF
DON JOHNSON, in his individual and
official capacity; BUREAU OF
POLICE CAPTAIN KELLY FITZGERALD,
in his individual and official
capacity; BUREAU OF POLICE
LIEUTENANT TRACY HERN, in his
individual and official capacity;
BUREAU OF POLICE OFFICER STEVEN
ROCHEVILLE, in his individual and
official capacity; BUREAU OF
POLICE OFFICER SCOTT CORTESE, in
his individual and official
capacity; and DOES 1 through 10,
          Defendants.
_____/

DEPOSITION OF STEVEN ROCHEVILLE
Volume II

Date:          Thursday, March 10, 2011
Time:          10:00 a.m.
Location:      THE LAW FIRM OF KALLIS & ASSOCIATES
               333 West San Carlos Street
               8th Floor
               San Jose, CA 95112

Reported by:   TERRY deDIEGO
               Certified Shorthand Reporter
               License No. 8978

**Paragon
Reporting
Services**
Certified Shorthand Reporters

210 North Fourth Street, Suite 205
San Jose, CA 95112-5569
(408) 295-8301
(800) 590-9958
Fax: (408) 295-4544
Paragoncsr@aol.com

**ORIGINAL**

1          A.   No, I had no specific information that he had

2     been violent in the past.

3          Q.   How about general information?

4          A.   I don't recall.

5          Q.   You don't recall or --

6          A.   I did not have any.  I'm sorry.  I did not have

7     any specific information at that time.

8          Q.   Okay.  Are there any other -- is there any

9     other information that you had that would show that

10    Mr. Cole had a mental disorder?  First of all, what is a

11    mental disorder?

12         A.   Um, my experience, it is something that, um --

13    it is a mental health issue that you would, um,

14    necessitate, um, seeing a doctor, a psychologist

15    perhaps --

16         Q.   Okay.

17         A.   -- regarding.

18         Q.   Did you see any signs of Mr. Cole having a

19    mental disorder?

20              MR. FOX:  The question is vague.  Signs.

21         Q.   (By Mr. Kallis):  Manifestations, indications.

22         A.   Um, specific signs, again, that I, um,

23    mentioned earlier, um, that he just appeared to be

24    tense, agitated, a blank stare.

25              In my experience -- in my training and my

                                                        179

Paragon Reporting Services (408) 295-8301

1    experience, that's something that I am keyed in to look

2    for for the possibility that somebody has a mental

3    health issue.

4         Q.  Isn't it true, Officer, that you are keyed to

5    look at everybody as if they are a potential mental

6    health issue or a threat to officer safety?

7              MR. FOX:  The question is compound.

8         Q.  (By Mr. Kallis):  Aren't you trained to do that

9    to everybody, to assess their mental state to the best

10   of your ability and to assess their officer safety

11   issues?

12        A.  Um, yes, I would say that.  You know, I

13   definitely do view people and try to make some

14   determination of their mental state as I speak to them.

15   And also, um, you know, I definitely do -- try to key in

16   on certain things for officer safety issues.

17        Q.  You were trained to do that, weren't you?

18        A.  Yes.

19        Q.  And it is a standard procedure and policy --

20             MR. FOX:  The question is vague.

21        Q.  (By Mr. Kallis):  -- to make those assessments?

22        A.  Well, it's -- just in general making those

23   assessments is a matter of officer safety because I

24   would need to definitely take into consideration

25   somebody's state of mind as I -- as far as an officer

                                                        180

1    safety standpoint.

2        Q.  What is your understanding based on your

3    training and experience as to what a mental disorder is?

4        MR. FOX:  Been asked and answered.

5        MR. KALLIS:  I am not asking for -- just to

6    clarify, I am not asking for the manifestations now.  I

7    am asking for his understanding of what a mental

8    disorder.

9        MR. FOX:  I think you asked him that and he

10   said something you would see a doctor or psychologist

11   for.

12       Q.  (By Mr. Kallis):  At the time that you

13   handcuffed Mr. Cole, had you determined that Mr. Cole

14   suffered from a mental disorder?

15       A.  At the time I handcuffed Mr. Cole, I believed

16   there was a possibility that he had a mental health

17   issue, yes.

18       Q.  Mental health issue?

19       A.  Yes.

20       Q.  And is there a difference between a mental

21   health issue and a disorder?

22       A.  I -- I would say you could use those -- in my

23   training and my experience, those would be

24   interchangeable.  At my, uh, understanding.

25       Q.  Okay.  So just so I understand it, if -- and

Paragon Reporting Services (408) 1293-8301

1    THE WITNESS:  I don't recall whether or not I

2    had spoke to that with Mr. Cole.

3        Q.  (By Mr. Kallis):  If you had -- well, strike

4    that.  Let me ask you about reports because we are

5    getting into the area of reports.

6        By the way, did you -- were you trained in

7    5150s in the POST academy?

8        A.  Um, I don't specifically recall what the

9    training was.  I know at some point there was, um,

10   training related to it to some manner, yes.

11       Q.  Have you had any subsequent training on it in

12   the last nine years?

13       A.  Um, I don't recall specific training regarding

14   that.

15       Q.  Is the answer no or you just don't know?

16       A.  I don't recall.

17       Q.  When was the last time prior to this incident

18   that you read the 5150 -- 5150 section of the Health and

19   Welfare Code?

20       A.  Of the Welfare and Institutions Code?

21       Q.  Yes.

22       A.  I don't recall.

23       Q.  Was it within a few years, a few months?

24       A.  I don't recall.

25       Q.  Okay.  Are you familiar with any other

                                                        186

 1    particular section of the 5150 code?

 2              MR. FOX:  The question is vague.

 3              MR. KALLIS:  Okay.  Let me clear it up.

 4         Q.  (By Mr. Kallis):  Between 5100 of the Welfare

 5    and Institutions Code and 5372, are you familiar with

 6    any other section other than 5150?

 7         A.  Um, no.

 8         Q.  What is your understanding based on your

 9    training and experience of the things that an officer

10    should consider in determining the existence of probable

11    cause?

12         A.  Okay.  In regards to an arrest?

13         Q.  5150.

14         A.  Oh, probable cause for 5150?

15         Q.  Correct.  I'm sorry.  That was badly phrased.

16    So for the record, let me clear it up.

17              What is your understanding of what an officer

18    needs to consider in making a probable cause

19    determination for a 5150?

20         A.  Um, and I believe this was already answered in

21    what I answered earlier to a similar question is that

22    officer needs to establish that somebody, um, is

23    suffering from some sort of mental health issue.

24              Um, and then as a result of that issue that

25    they are a danger to either themselves, to others or are

                                                         187

Paragon Reporting Services (408) 295-9501

1    gravely disabled.

2        Q.  Okay.  Do you know if there is any section of

3    the health and institution codes or welfare and

4    institution codes that deal with that?

5            MR. FOX:  The question is vague.

6        Q.  (By Mr. Kallis):  Deal with the issues that

7    should be considered by an officer in making a 5150

8    determination?

9        A.  I am not familiar with anything out -- other

10   than the actual, uh, specific code, the 5150.  I

11   wouldn't have specific knowledge of any other code.

12       Q.  So if there was a 5151, for example, you

13   wouldn't have knowledge of that one?

14       A.  No direct knowledge.

15       Q.  Okay.  How about indirect from training or --

16       A.  I wouldn't -- I couldn't recall.  Um, if I had

17   learned about another specific section, I wouldn't

18   recall a specific section, um.  The section that I in my

19   experience deal with the most would be section 5150 of

20   the welfare -- of the welfare institution code.  That's

21   the one that I deal with most frequently.

22       Q.  Okay.  Getting back to the reason that you

23   determined you were going to enter the house, I believe

24   you said it was for a welfare check; is that correct?

25       A.  That's correct, yes.

                                                    188

1    Q.  So what are the two, if you know, what is your

2    understanding of the criteria that allow a welfare

3    check?

4    A.  Um, it is -- welfare check is essentially a

5    matter of -- I think the courts refer to it as community

6    caretaking where you establish some circumstances where

7    you feel -- you determine that there is a need to check

8    on, um, the -- in this case in the home, the residents

9    of the home, to ensure their safety and that they

10   don't -- aren't in need of any some sort of assistance.

11   Q.  So your entry was under a community caretaker

12   exception?

13   A.  Yes.

14   Q.  Is there another exception within the welfare

15   check that would apply for justifying a warrantless

16   entry, not necessarily in this situation?

17   A.  For justifying a warrantless entry?  Are you,

18   you know, possibility of exigent circumstances is

19   another --

20   Q.  I didn't ask that question well.

21   A.  Okay.

22   Q.  Let me rephrase it.

23   Community caretaker is one of the factors that

24   allow a warrantless entry under a welfare check.  Okay?

25   Is there any other category that allows a

189

1    warrantless entry under a welfare check that you are

2    aware of?

3         A.   I'm sorry.  Could you repeat that.

4              THE REPORTER:  "Question:  Community caretaker

5    is one of the factors that allow a warrantless entry

6    under a welfare check.  Okay?  Is there any other

7    category that allows a warrantless entry under a welfare

8    check that you are aware of."

9              THE WITNESS:  Um, not that I could specify.

10        Q.   (By Mr. Kallis):  Did you have any information

11   that there was anyone in the house who posed a threat to

12   you?

13        A.   Um, no, I did not have any information anybody

14   posed a threat to me.

15        Q.   So your entry was not an officer safety based

16   protective sweep; is that correct?

17        A.   That's --

18             MR. FOX:  The question is vague.  Are you

19   talking about entry of the garage or the house?

20             MR. KALLIS:  House.

21             MR. FOX:  House.

22             THE WITNESS:  Not for an officer safety issue.

23   It was for again a welfare check of the occupants.

24             MR. KALLIS:  Okay.

25        Q.   (By Mr. Kallis):  Did you have any reason to

190

1        I, Terry deDiego, a Certified Shorthand

2  Reporter in and for the State of California, hereby

3  certify that the witness in the foregoing deposition,

4            STEVEN ROCHEVILLE,

5  was by me duly sworn to tell the truth, the whole truth

6  and nothing but the truth in the within-entitled cause;

7  that the foregoing is a full, true and correct

8  transcript of the proceedings had at the taking said

9  deposition to the best of my ability.

10

11    DATE: March 20, 2011

12

13

14  Terry deDiego

      CSR License No. 8978

15

16

17

18

19

20

21

22

23

24

25

                    260

# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RUSSELL COLE, an individual; and
STEPHANIE OBERG, an individual,
      Plaintiffs,
   vs.                   No. C-08-05017 PVT
CITY OF SUNNYVALE, a municipal
corporation within the State of
California; BUREAU OF POLICE CHIEF
DON JOHNSON, in his individual and
official capacity; BUREAU OF
POLICE CAPTAIN KELLY FITZGERALD,
in his individual and official
capacity; BUREAU OF POLICE
LIEUTENANT TRACY HERN, in his
individual and official capacity;
BUREAU OF POLICE OFFICER STEVEN
ROCHEVILLE, in his individual and
official capacity; BUREAU OF
POLICE OFFICER SCOTT CORTESE, in
his individual and official
capacity; and DOES 1 through 10,
      Defendants.
_____/

DEPOSITION OF SCOTT CORTESE

Date:          Thursday, March 31, 2011
Time:          9:38 a.m.
Location:     BUSTAMANTE, O'HARA & GAGLIASSO, P.C.
              333 West San Carlos Street
              8th Floor
              San Jose, CA 95110

Reported by:  TERRY deDIEGO
              Certified Shorthand Reporter
              License No. 8978

Paragon Reporting Services
Certified Shorthand Reporters

210 North Fourth Street, Suite 205
San Jose, CA 95112-5569
(408) 295-8301
(800) 590-9958
Fax: (408) 295-4544
Paragoncsr@aol.com

CERTIFIED COPY

Paragon Reporting Services

1     Q.  (By Mr. Stearns):  Or in the garage.

2     A.  Did we talk about it, no.

3     Q.  At this point in time did you and Lieutenant

4  Hern talk about having Ms. Oberg come out to the garage

5  to speak to Mr. Cole?

6     A.  I don't recall.  I don't think so.

7     Q.  I believe I skipped this, too.

8         At the time you went into the house, was

9  Mr. Cole already handcuffed?

10    A.  Yes.

11    Q.  Who handcuffed Mr. Cole?

12    A.  Officer Rocheville.

13    Q.  Prior to Mr. Cole being handcuffed, did you and

14  Officer Rocheville talk about handcuffing him?

15    A.  Talk about it, no.

16    Q.  What is your understanding of the reason why

17  Mr. Cole was handcuffed?

18    A.  He was being detained.

19    Q.  Why was he being detained?

20    A.  Possible 5150, and then we needed to

21  investigate the possible 422 threats.

22    Q.  What is your understanding of the requirements

23  to detain someone under a 5150?

24    A.  For the detention as far as taking them to

25  emergency psychiatric or just detaining them in

77

1  handcuffs until we can establish more information?

2      Q.  My understanding from your testimony is you

3  detained him for a possible 5150.

4      A.  Officer Rocheville.

5      Q.  Officer Rocheville.  I am talking about in

6  general what are the requirements to do that type of

7  retention.  That's the only time I am talking about

8  anymore.

9      A.  5150 Code says the person is a danger to

10  themselves or others or disabled.

11      Q.  As far as prior to Mr. Cole being handcuffed

12  and detained, what did you perceive as being a --

13  Mr. Cole being a danger to himself?

14      A.  To himself?

15      Q.  Yes.

16      A.  No.

17      Q.  As far as the same time period prior to him

18  being detained possible 5150, what did you perceive as

19  Mr. Cole being a danger to others?

20      A.  The comment that he made that this would be

21  over.  His angry mannerism.  The way that he shut down,

22  went into this catatonic stare.  His actions were not of

23  a normal person that we deal with on a day-to-day basis.

24          We contact people every day all day long.  And

25  when somebody is slightly imbalanced as far as mentally,

                                                    78

Cole v. City of Sunnyvale              Scott Cortese, March 31, 2011

1   the same time?

2       A.   Correct.

3       Q.   And that was at approximately 12605 or 12625 --

4   10625?

5       A.   106 is when I put myself back in service, yes.

6   I believe he parked closer and I had to walk farther

7   away.

8       Q.   That seems about right.  You were on scene for

9   about an hour?

10      A.   Yes.

11      Q.   As part of your training as a police officer,

12   you received training on search and seizure; correct?

13      A.   Correct.

14      Q.   As part of that, you received some training on

15   how to obtain search warrants?

16      A.   Correct.

17      Q.   Training on what constitutes probable cause for

18   conducting a search?

19      A.   Correct.

20      Q.   And my understanding is your probable cause for

21   the secondary search of the house this time was the

22   8102.

23       Have you had any specific training or classes

24   on searches incident to 5150?

25      A.   Prior to this call, no.

                                                        109

1    Q.  Yeah.  Prior.  Exactly.  Prior to this call.

2    A.  Exactly.

3    Q.  Since this call, you have had training, though?

4    A.  Since we have had this call, there has been a

5    change in the law.  So yes.

6    Q.  The changes in law which happen at various

7    times, thank you lawyers, how were those given to you?

8    A.  Depending either briefing trainings, they will

9    send stuff out on e-mail, we get a point of view booklet

10   that we can go through for most of that is where we get

11   our updates from.

12        And during our training sessions, nine out of

13   the 12 months of the year we get a full day of training

14   between police, fire, updates, all that stuff.  So they

15   will disseminate it through that and it will be an

16   hour-long discussion or however long it needs to take

17   for new laws to take effect.  We'll go over it all then

18   at a training scenario with all the teams.

19   Q.  You have a duty manual?

20   A.  Yes.

21   Q.  That duty manual available to you on your

22   computer in the car as well?

23   A.  Yes, it is in the cars now.

24   Q.  As far as your briefing, you have briefings

25   each day before you begin your shift?

110

Paragon Reporting Services

1          I, Terry deDiego, a Certified Shorthand

2     Reporter in and for the State of California, hereby

3     certify that the witness in the foregoing deposition,

4               SCOTT CORTESE,

5     was by me duly sworn to tell the truth, the whole truth

6     and nothing but the truth in the within-entitled cause;

7     that the foregoing is a full, true and correct

8     transcript of the proceedings had at the taking said

9     deposition to the best of my ability.

10

11          DATE: April 4, 2011

12

13          _____

14               Terry deDiego

               CSR License No. 8978

15

16

17

18

19

20

21

22

23

24

25

                                                            119

# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RUSSELL COLE and STEPHANIE OBERG,

        Plaintiffs,

    vs.

SUNNYVALE, CHIEF DON JOHNSON,
OFFICER STEVEN ROCHEVILLE,
LIEUTENANT TRACY HERN,
OFFICER SCOTT CORTESE, and
CAPTAIN KELLY FITZGERALD,

        Defendants.

CASE NO: C08-05017 RMW

DEPOSITION OF TRACY HERN
VOLUME I (Page 1-132)

Date:          Wednesday, March 16, 2011
Time:          9:51 a.m.
Location:      THE LAW FIRM OF KALLIS & ASSOCIATES
               333 W. San Carlos
               Suite 800
               San Jose, CA 95112

Reported by:   MECHELLE S. GONZALEZ
               Certified Shorthand Reporter
               License No. 13250



Paragon
Reporting
Services
Certified Shorthand Reporters

210 North Fourth Street, Suite 205
San Jose, CA 95112-5569
(408) 295-8301
(800) 590-9958
Fax: (408) 295-4544
Paragoncsr@aol.com

**CERTIFIED COPY**

Paragon Reporting Services (408) 295-8301

1    service or help, not escalating a situation.

2         Q.  And do they give you any methods for negating

3    escalation?

4         A.  I don't recall if there is any specific

5    methods, no.

6         Q.  And what training have you received on

7    Welfare and Institutions Code Sections 5150 and on?

8         A.  I don't recall specific training from the

9    academy, sir.

10        Q.  Do you recall having any training on that?

11        A.  I do recall training during the academy.  I

12   don't know if it's specifically -- I know it dealt with

13   5150 welfare institutions.  I do know that I was taught

14   during field training about the 5150 procedures and

15   policies of our department and the guidelines for the

16   paperwork associated with it.

17        Q.  What are the procedures within your department

18   for 5150?

19        A.  The basic procedures is to defuse if situation,

20   if necessary, and to assess the person to determine if

21   that person is a danger to him or herself, a danger to

22   others or greatly disabled, and then to seek the proper

23   care or medical attention that's needed.

24        Q.  And are you trained in any other parts of the

25   Welfare and Institution Code that relate to 5150?

                                                          40

Cole v. Sunnyvale                    Tracy Hern, March 16, 2011

Paragon Reporting Services (408) 295-8301

1        A.  I don't recall if I was trained in specific

2    other sections.

3        Q.  Did you at any point develop an understanding

4    of other sections that relate to 5150?

5        A.  Could you be more specific as to what sections

6    or what concepts?

7        Q.  Sure.  That's easy.  Let's talk about 5150.4.

8            How about that?

9            MR. FOX:  Well, you have the book.  He doesn't.

10   Can he take a look at it.

11           BY MR. KALLIS:  Q.  Assessments.  Do you recall

12   any training in assessments?

13       A.  For that particular section, I don't recall.

14       Q.  How about 5152?

15           MR. FOX:  You have the book.  He doesn't know

16   it.

17           BY MR. KALLIS:  Q.  Evaluations or release of

18   further treatment.

19       A.  I don't recall that particular section.

20       Q.  5151, admission for 72-hour treatment.

21       A.  I'm sure that all of theses sections were

22   lumped under 5150 training.  Whether they are broken

23   into specific sections, I don't recall.

24       Q.  When was the last time you reviewed chapter 2,

25   Involuntary Treatment which deals with 5150, et sec?  Et

41

Cole v. Sunnyvale                    Tracy Hern, March 16, 2011

1   sec meaning additional sections?

2        A.   I have no idea.

3        Q.   Does the department give you training on 5150

4   on a regular schedule or on a regular basis?

5        A.   I don't know if it's a regular schedule or a

6   regular basis.  There are periodic training that's

7   provided.

8        Q.   When was the last time you were trained in

9   5150, et sec?

10       A.   I have no idea.

11       Q.   Would it be in your training records?

12       A.   It's possible.

13            MR. FOX:  I want to take a break about 11:00.

14            MR. KALLIS:  Pardon?

15            MR. FOX:  I'll need to take a break around

16   11:00.

17            MR. KALLIS:  I'm on a roll here.

18            MR. FOX:  It's not 11:00 yet, but I'm just

19   saying.

20            BY MR. KALLIS:  Q.  Do you have any training

21   records with you?

22       A.   No, sir.  You have them.

23       Q.   I know I do.

24       A.   No.  In my folder, sir.

25       Q.   In your folder.  Oh, I see.  Thank you.  I

                                                        42

Paragon Reporting Services (408) 295-8301

1    think I also have them elsewhere.  Here we go.

2            Are these the training records?

3    A.   I believe so.

4    Q.   Take a look at them and make sure they are

5    complete.

6        A.   They are complete as I can recall.  This was

7    actually provided to me by my attorney.

8            MR. KALLIS:  If we could mark that as I think

9    27, please.

10           (Exhibit 27 marked.)

11           MR. FOX:  Do we have copies?

12           MR. KALLIS:  Yes.  We can make copies at the

13   break.  I don't think I have another copy.  I'm just

14   trying to find it right now.

15           BY MR. KALLIS:  Q.  Take a look at that, if you

16   would, and there was a question that I asked that

17   specifically dealt with when you had your last training

18   on 5150, et sec.

19           MR. KALLIS:  And in order to be accurate, I'm

20   going to ask the reporter to read that back, the last

21   question.

22           (Record read.)

23           BY MR. KALLIS:  Q.  Can you answer that,

24   Lieutenant?

25       A.   I'm looking, sir.  It's possible.  The last

43

```
 1    time I was trained in the area of 5150 would have been

 2    January 26, 2009.

 3        Q.  And how about before that?

 4        A.  It's possible it would be April 9th, 1997.

 5        Q.  Hang on a second.

 6        A.  And also February 13th, 1997.

 7        Q.  I have to get to 1997.  What were the two

 8    dates?

 9        A.  Looks like April 9th, 1997, Suicide

10    Crisis/Hostage Negotiations, and then just below that on

11    February 13th, 1997, Mentally Ill/Developmentally.

12        Q.  Anything else you can see?

13        A.  No.  It looks like that's it, sir.

14        Q.  Let's go to the 2009 on that you mentioned.  I

15    believe the title of that is Preventing Law Enforcement

16    Suicides.

17        A.  Yes, sir.

18        Q.  Was that mental health of law enforcement

19    officers or mental health of the public?

20        A.  I believe that would be from the title mental

21    health of the officers.

22        Q.  Do you have any independent recollection of

23    what that program covered?

24        A.  No, sir.

25        Q.  In your career have you ever taken a police
```

44

Paragon Reporting Services (406) 293-8301

1   officer in on a 5150?

2       A.  No, sir.

3       Q.  Let's take a look at the 4/9/97 one.  Suicide

4   Crisis Hostage Negotiations.

5           Did that cover, if you have any recollection of

6   it, did it cover anything about diagnosing, assessing or

7   evaluating individuals?

8       A.  I have no recollection of that class.

9       Q.  How about the Mentally Ill/Developmentally?

10      A.  I have no recollection of that class, sir.

11      Q.  Do you have any recollection of any of the

12  training you received with respect to 5150, et sec?

13          MR. FOX:  In addition to what he's testified to

14  already?

15          MR. KALLIS:  Yes.  If he has any recollection

16  of any training he received.

17          MR. FOX:  In additional to what he's testified

18  to already?

19          MR. KALLIS:  He's testified that he has no

20  recollection, so it would be excluded.

21          MR. FOX:  Well, he testified that he was

22  trained to defuse the situation, assess the person in

23  terms of danger.

24          MR. KALLIS:  Yes, you are correct.

25          MR. FOX:  Can you read back the question,

                                                        45

Cole v. Sunnyvale                    Tracy Hern, March 16, 2011

1    please?

2           (Record read.)

3           MR. KALLIS:  And we'll add to it other than

4    what you've previously testified to.  Thank you.

5           THE WITNESS:  I have no specific recollection

6    of the training.

7           BY MR. KALLIS:  Q.  Do you have any general

8    recollection other than what you have testified to?

9       A.  Yes, sir.

10      Q.  What is your understanding based on the

11   totality of your experience and training of what the

12   Fourth Amendment warrant requirement requires of police

13   officers?

14      A.  The Fourth Amendment is protection against

15   unlawful search and seizure.

16      Q.  And what does it require of police officers

17   from your understanding?

18      A.  From my understanding it would require a search

19   warrant for unlawful searches to make them lawful

20   searches.

21      Q.  And are there any exceptions to the requirement

22   that an officer have a warrant to make a search or

23   seizure?

24      A.  Yes, sir.

25      Q.  And to the best of your understanding, what are

                                                        46

1    those exceptions?

2         A.   There is the exception that Officer Rocheville

3    covered the other day with an incident to arrest.  We

4    have the right to search the person.  We have -- are we

5    talking vehicles or just --

6         Q.   Anything.

7         A.   There are vehicle exceptions such as the

8    inventory search of a vehicle prior to towing it for

9    security.  There are the search of a vehicle, incident

10   to arrest which then goes hand in hand with the

11   inventory search.  You would have a fresh pursuit or hot

12   pursuit situation allowing you to make an entry.

13        I'm drawing a blank right now.

14        Q.   Is there an exception to your recollection to

15   preserve evidence that may be destroyed?

16        A.   Yes, sir.

17        Q.   Are there any others that you can think of?

18        A.   I'm sure there are, but I can't think of any

19   right now.

20        Q.   Is there an exception for the care of

21   individuals?

22        A.   Yes, sir.

23        Q.   Referred to usually as the caretaker exception?

24        A.   Yes, sir.

25        Q.   What is the caretaker exception as you

                                                          47

Paragon Reporting Services (408) 295-8301

1    understand it?

2         A.   As I understand it, the community caretaker

3    exception allows officers to check on the welfare of

4    individuals.

5         Q.   Are there any requirements for a community

6    caretaker function exigency to exist?

7         A.   I believe that you have to have the belief that

8    somebody could be in the need of aid.

9         Q.   Any type of belief?

10        A.   I don't know what you're getting at, sir.

11        Q.   Well, what circumstances or situations or facts

12   do you have to have in order to enter a private dwelling

13   to do a caretaker search?

14        A.   I believe each situation is going to be

15   different, and you would have to take the totality of

16   the circumstances to make that decision for each

17   instance.

18        Q.   Are there criteria that you use to evaluate the

19   circumstance?

20        A.   I don't know what kind of criteria you would be

21   referring to.

22        Q.   Beyond the caretaker exception, is there any

23   other exception?

24        A.   As I said before, I'm sure there is, but I'm

25   drawing a blank right now.

                                                              48

Cole v. Sunnyvale                    Tracy Hern, March 16, 2011

Paragon Reporting Services (408) 295-8301

1          MR. FOX: I do need to make a call in a moment.

2          MR. KALLIS: Let's take a break.

3       (Recess taken from 11:08 a.m. to 11:38 a.m.)

4          BY MR. KALLIS: Q. We were talking about the

5 caretaker exception.

6          Is there an emergency aided exception to the

7 warrant requirement?

8     A. I don't know if it's separate than the

9 community caretaking.

10    Q. Let's talk for a second about the community

11 caretaking.

12        What is your understanding of the purpose of

13 the community caretaking?

14    A. To check on the welfare and provide needed

15 assistance or aid for someone who potentially could be

16 injured or in need of assistance.

17    Q. Are there any other exceptions that you can

18 think of?

19    A. Not at this time.

20    Q. I'd like to have you, if you would, take a look

21 at a document we produced dated -- the original

22 documented was dated June '09 -- well, before I get to

23 that, do you have a critical response team assignment,

24 CRT?

25    A. No, I don't believe we have a CRT. We have

                                            49

1    CIT, Critical Incident Team.  We have CISM.

2         Q.  Do you have a CIT?

3         A.  Yes, I believe so.

4         Q.  And what is the CIT?

5         A.  Critical Incident Team.

6         Q.  And is there any particular function of that

7    team?

8         A.  I believe their primary responsibility is to

9    respond to calls of mentally disturbed or ill persons to

10   assist in the facilitation of seeking aid or coming to

11   the agreed upon resolution of a situation.

12        Q.  And were any members of your team on

13   November 5th and 6th 2008 CIT trained or CIT members?

14             MR. FOX:  Just for the record, when you say

15   "team," do you mean squad?

16             MR. KALLIS:  Squad.

17             THE WITNESS:  To be honest, I don't know if we

18   had CIT at this time.  If we did, I don't think anybody

19   on that team was a CIT member.

20             BY MR. KALLIS:  Q.  Have you been trained as a

21   CIT person?

22        A.  No, sir.

23        Q.  What were the policies and procedures of the

24   Sunnyvale Public Safety Department with respect to

25   mentally disturbed individuals in their evaluation?

50

Paragon Reporting Services (408) 295-8301

1          MR. FOX:  Can you read that back, please?

2          (Record read.)

3          MR. FOX:  It's a little bit vague.  If you

4     understand it, you can respond.

5          MR. KALLIS:  Let me rephrase.  I don't believe

6     that it was un-interpretable or un-understandable.

7          BY MR. KALLIS:  Q.  Does Sunnyvale have any

8     procedures for the evaluation of individuals you believe

9     may be or any officer believes may be mentally impaired?

10         A.  There is a policy regarding persons who are

11    mentally impaired or disabled, mentally ill.  I don't

12    know if where you mean the same thing by evaluation.

13         Q.  Can you tell me what you mean by evaluation?

14         A.  I'm assuming that what you're referring to is

15    the actual process of evaluating a person to see if they

16    are a danger to themselves, to others or greatly

17    disabled.

18         Q.  And is there a policy and/or procedure for

19    doing that?

20         A.  I believe there is a policy that says we shall

21    do that.

22         Q.  Does it give you any guidance?

23         A.  I'm sure it does.

24         Q.  On the night of the incident, did you look up

25    that policy?

                                                        51

1          A.   No, sir.

2          Q.   Did you know it by heart?

3          A.   No, sir.

4          Q.   Did you ask any of the officers on your squad

5     to look up the policy or whether they knew it by heart?

6          A.   No, sir.

7          Q.   Let me show you what's going to be marked as

8     Exhibit 28, and it's in that book there.  You will find

9     it under Tab 27.

10              (Exhibit 28 marked.)

11              BY MR. KALLIS:  Q.  So we'll mark Tab 27, and

12    we'll give that to you.

13              MR. KALLIS:  And the officer can use it right

14    now.

15              MR. FOX:  Do you want me to take it out of the

16    book?

17              MR. KALLIS:  Sure.

18              MR. FOX:  So there are two separate documents

19    within Tab 27.  Do you want both marked?

20              MR. KALLIS:  I want all created as one.

21              MR. FOX:  I'll hand this to the reporter.

22              BY MR. KALLIS:  Q.  Will you take a look at

23    what's been marked as Exhibit 28.

24              Do you see it there in front of you?

25         A.   Yes, sir.

                                                          52

1      Q.   Is it your understanding that the first two

2  pages which are marked SUN 00138 and 00139 constitutes

3  the department of public safety mental health service

4  evaluation criteria?

5      A.   Yes, sir.   That's what it's titled.

6      Q.   And is that your understanding that's what this

7  document -- the two pages represent?

8      A.   Yes, sir.

9      Q.   And you were familiar with this at the time of

10 the incident in November 5/6 of 2008?

11     A.   Was I familiar with it?

12     Q.   Yes.

13     A.   Yes, sir.

14     Q.   And this was the policy that was in effect at

15 this time; correct?

16     A.   I believe so.

17     Q.   I want to go through this, if I can, and I'd

18 like to ask you, if you would, to take a look at

19 3.2.02A.

20          What criteria are set forth in 5150?

21     A.   A person who is a danger to himself or herself,

22 a danger to others or gravely disabled.

23     Q.   And how do you make that determination based on

24 this policy?

25     A.   I don't understand the question.

                                                        53

Paragon Reporting Services (408) 295-8301

1      Q.   How do you make the determination of persons

2   gravely disabled?

3      A.   You would have to depending on the situation

4   take the totality of the circumstances with each

5   particular situation and determine whether that person

6   is able to care for themselves to continue life.

7      Q.   Have you read the definition of gravely

8   disabled in the Welfare and Institutions Code?

9      A.   Not recently.

10     Q.   Did you know it on the night of the incident?

11     A.   I believe I had a general understanding of it.

12     Q.   When was the last time you looked at it?

13     A.   I have no idea, sir.

14     Q.   Do you know if Officer Rocheville had looked at

15   or knew what the gravely disabled was?

16     A.   I have no idea.

17     Q.   And what are the criteria for determining

18   whether a person is a danger to themselves?

19     A.   Well, you kind of answered that yourself.  If

20   they're going to hurt themselves, or if they are a

21   danger to themselves.

22     Q.   So isn't it true that any person could hurt

23   themselves?

24     A.   Yes, sir.

25     Q.   And isn't it true that any person is a danger

54

Cole v. Sunnyvale                    Tracy Hern, March 16, 2011

1    to themselves or could be?

2         A.   In a general sense that you're speaking of?  It

3    could be.  Absolutely.

4         Q.   So from your perspective does it require more

5    than just the possibility that they may be a danger to

6    themselves or hurt themselves?

7         A.   Well, I think you're trying to put words in my

8    mouth, sir.  5150 we're talking about a specific

9    incident which I think is what we were referring to.

10   Not just the general possibility.  Anything can happen I

11   believe is what you said before.

12        Q.   Well, let's go to 5150 in particular.  You said

13   danger to self.

14             What indicators do you look for to determine if

15   a person is a danger to self?

16        A.   There could be indicators such as a person who

17   makes threats to harm themselves, physically harm

18   themselves.  There could be information from outside

19   sources that a person has made mention of hurting

20   themselves.  There could be indications, physical

21   indications that a person has or is about to hurt

22   themselves.

23        Q.   And what physical indication would you have

24   that a person was about to hurt themselves?

25        A.   It could be the notes that are left, it could

                                                          55

1   be a gathering of, say, pill bottles and alcohol under

2   the totality of the circumstances and the situation at

3   hand.

4       Q.  Let's talk about self threats.  There are lots

5   of expressions that people make.  "God, if I lose this

6   case, I could kill myself."

7           MR. FOX:  I hope not.

8           MR. KALLIS:  I'm not going to lose it, so

9   that's not a problem.

10           MR. FOX:  Okay.

11           BY MR. KALLIS:  Q.  But if I made that threat

12   or that statement, would that be a threat that I am a

13   danger to myself?

14       A.  It could be.

15       Q.  At what point does a mere statement of

16   possibility become sufficiently current or sufficiently

17   viable to turn it from responsibility into likely?

18       A.  I don't know if there is a specific point where

19   it turns.  As I said before, it's the totality of the

20   circumstances.  As public safety officers we try to

21   gather as much information as we can prior to making any

22   decisions of that magnitude.

23       Q.  And then you said "outside sources."

24       What do you mean by that?

25       A.  Outside sources could be from other parties

    56

Paragon Reporting Services (408) 295-8301

1    that have information with threats that have been made

2    before, threats that have been made currently at the

3    time.  Psychiatric or psychological history,

4    medications, or any types of sources outside of the

5    individual.

6         Q.  So if I said to you, "For the last seven years

7    my mother has been threatening to kill herself."  Which,

8    by the way, is a true statement, would that be a threat

9    for self harm that you would take as being sufficient to

10   raise your level of concern?

11        MR. FOX:  I'm going to object as an incomplete

12   hypothetical, and it does require the witness to

13   speculate.

14        If you're able to respond to the question as he

15   phrased it, you certainly may.

16        BY MR. KALLIS:  Q.  If the wife of someone you

17   went to see on duty said, "For 70 years my husband has

18   been threatening to kill himself."  That's an outside

19   source giving you information.  Would that be sufficient

20   information in your mind to treat that person as a risk

21   themselves?

22        A.  In my mind, no.

23        Q.  Why?

24        A.  I'm sorry?

25        Q.  Why?

57

Cole v. Sunnyvale                    Tracy Hern, March 16, 2011

1     A.  As I said before, it's the totality of the

2    circumstances.  If the subjects are then threatening to

3    commit suicide or hurt themselves for 70 years, I

4    believe past practice would show that it is an empty

5    threat that has not gone through.  Unless I was able to

6    determine any other information surrounding the specific

7    incidents to show the person is a harm to themselves or

8    others at this point in time, then no, I would not take

9    them and detain them for 5150.

10     Q.  Can you think of any other particular things

11    that you would look for besides self threats, outside

12    threats, physical indication that someone is about to do

13    something or has done something to harm themselves?

14     A.  That's a long question.

15          THE WITNESS:  Can you read that back?  Sorry.

16          (Record read.)

17          THE WITNESS:  Again, I would have to say it is

18    the totality of the circumstance.  It really is.  It's

19    everything combined.

20          BY MR. KALLIS:  Q.  How about danger to others.

21    What do you look for there?

22     A.  Danger to others in my mind would be someone

23    who has made threats to either a particular person, to a

24    group of persons, or to general population or general

25    public.

58

1    correct?

2         A.   Yes.

3         Q.   So what is the basis for your belief that you

4    had authority to search the Cole residence without a

5    warrant at that time?

6         A.   Prior to the search for the weapons was

7    conducted, I clarified with Officer Rocheville if

8    Mr. Cole was, in fact, detained for a 5150, which he did

9    say yes, he was.  Maybe not in as many words, but he

10   said yes, he's detained for 5150 and would be going to

11   Valley Medical Center.

12        With 5150 comes into play our policy in the

13   section of 8102 of the Welfare Intuitions Code where our

14   policy says any person who is detained under 5150 to be

15   seen or brought to medical attention that the officer

16   shall make every effort to locate weapons and confiscate

17   those weapons per 8102.

18        MR. FOX:  8102 of the --

19        THE WITNESS:  Welfare and Institutions Code.

20        MR. FOX:  Thank you.

21        BY MR. KALLIS:  Q.  Let's take a look at the

22   policy which has already been marked Exhibit 28.  Please

23   turn to page 2 of it.

24        Is that the policy you're referring to?

25        A.   Yes, it is.

                                                        124

Cole v. Sunnyvale                    Tracy Hern, March 16, 2011

1        Q.   Do you see in there where it says "every

2   effort"?

3        A.   I do not see those words.

4        Q.   Do you see words in your policy that says that

5   you are allowed to do that without a warrant?

6        A.   I do not see that in the policy.

7        Q.   Do you see anywhere in the policy where it says

8   that you must immediately search the home?

9        A.   I don't see that, no.

10       Q.   Is there any other policy that you're aware of

11   that was in effect at that time the Sunnyvale Police

12   Department that was included in or part of the policy

13   for 5150s and 8102s?

14       A.   I don't believe so.

15       Q.   On what basis did you believe that the

16   immediate search of the home was authorized?

17       A.   As part of our thorough investigation, and to

18   ensure the safety of Mr. Cole and any other persons in

19   the house, my belief is that we would have to do the

20   search to confiscate any weapons that we believed were

21   there or we knew were there for a fact.

22       Q.   Did you know for a fact that there were weapons

23   there?

24       A.   No, we did not.

25       Q.   Let me see if I have this straight.  Mr. Cole

125

1   is in handcuffs with officers around him and/or about to

2   be transported to Valley Medical; is that correct?

3        A.   Yes, sir.

4        Q.   He has no way at this point of getting to any

5   of those guns, did he?

6        A.   Not at that point.

7        Q.   So if there were guns in the house at that

8   point, they were a danger -- as far as Mr. Cole is

9   concerned, they weren't a danger to anybody, were they?

10       A.   At that moment, no.

11       Q.   Now, if you will be kind enough to look at

12  8102.  Actually this is a current version, so let's not

13  do that.

14            Is there anything that made you believe that

15  you had a right to search then as a result of the a

16  cumulative danger other than what you have already

17  expressed?  Is there any code that gave you that right?

18            MR. FOX:  Other than what he's described.

19            MR. KALLIS:  Yes.

20            MR. FOX:  Thank you.

21            THE WITNESS:  Other than what I've described,

22  no.

23            BY MR. KALLIS:  Q.  Did you feel that under

24  5150 and 8102 that it was necessary at that point to

25  search the house?

                                                    126

Paragon Reporting Services (408) 2539830?

```
 1        A.   Coupled with our policy, yes, I did.

 2        Q.   So that was the policy of the Sunnyvale Police

 3   Department or public safety to do that?

 4        A.   To confiscate any weapons.

 5        Q.   No.  To search as soon as the person had been

 6   determined to be a 5150?

 7        A.   That was standard operating procedures, yes.

 8        Q.   And are you aware of any section of 5150 that

 9   changes the requirements to follow the warrant laws?

10        A.   I don't have any direct knowledge of any

11   changes to 5150.

12        Q.   Or anything in 5150.  I'm talking about not

13   only that one section, but I'm talking about the whole

14   5150 section of the Welfare Institutions.

15        A.   Without looking at it I wouldn't be able to

16   tell you.

17        Q.   And have you been trained on how to seek a

18   warrant?

19        A.   Yes, I was.

20        Q.   And have you in the past received warrants that

21   you applied for?

22        A.   Search warrants?  Arrest warrants?

23        Q.   Let's call search warrants.

24        A.   Search warrants, I have not ever applied for a

25   search warrant.
```

127

Paragon Reporting Services

1      Q.  Do you know how to?

2      A.  I know how to, yes.

3      Q.  Is there a method for getting a search warrant

4  in the middle of the night?

5      A.  There is guidelines and policies that we have

6  in place and a protocol to follow.

7      Q.  So you can get a search warrant in the middle

8  of the night?

9      A.  Yes.

10      Q.  Could you have gotten a search warrant to

11  search Mr. Cole's residence?

12          MR. FOX:  Calls for speculation.

13          MR. KALLIS:  No.  Could he have gotten one.

14          MR. FOX:  You mean physically obtain the

15  warrant?

16          MR. KALLIS:  Going through the procedures to

17  get the warrant.

18          MR. FOX:  If you're asking him if he could

19  perform the procedures, that's one thing.  Whether or

20  not a judge is available is something else.

21          BY MR. KALLIS:  Q.  Could you have gone through

22  the procedures to get the warrant?

23      A.  I could have, yes.

24      Q.  And how long do you believe it would take to

25  get a telephonic warrant?

                                                    128

Cole v. Sunnyvale                    Tracy Hern, March 16, 2011

1          I, MECHELLE S. GONZALEZ, a Certified Shorthand

2     Reporter in and for the State of California, hereby

3     certify that the witness in the foregoing deposition,

4                    TRACY HERN,

5     was by me duly sworn to tell the truth, the whole truth

6     and nothing but the truth in the within-entitled cause;

7     that the foregoing is a full, true and correct

8     transcript of the proceedings had at the taking said

9     deposition to the best of my ability.

10

11        DATE: March 16, 2011

12

13

14        MECHELLE S. GONZALEZ

          CSR License No. 13250

15

16

17

18          Upon completion of the foregoing transcript,

19     the witness was notified it was ready for signature, but

20     the deposition was not signed by the witness for the

21     following reason:

22     _____

23     _____

24     _____

25     _____

                                                      132

Cole v. Sunnyvale                    Tracy Hern, March 16, 2011

# EXHIBIT D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RUSSELL COLE, an individual; and
STEPHANIE OBERG, an individual,
        Plaintiffs,
    vs.                                 No. C-08-05017 PVT
CITY OF SUNNYVALE, a municipal
corporation within the State of
California; BUREAU OF POLICE CHIEF
DON JOHNSON, in his individual and
official capacity; BUREAU OF
POLICE CAPTAIN KELLY FITZGERALD,
in his individual and official
capacity; BUREAU OF POLICE
LIEUTENANT TRACY HERN, in his
individual and official capacity;
BUREAU OF POLICE OFFICER STEVEN
ROCHEVILLE, in his individual and
official capacity; BUREAU OF
POLICE OFFICER SCOTT CORTESE, in
his individual and official
capacity; and DOES 1 through 10,
        Defendants.
_____/

DEPOSITION OF KELLY FITZGERALD

Date:           Thursday, April 14, 2011
Time:           9:45 a.m.
Location:       THE LAW FIRM OF KALLIS & ASSOCIATES
                333 West San Carlos Street
                8th Floor
                San Jose, CA 95112

Reported by:    TERRY deDIEGO
                Certified Shorthand Reporter
                License No. 8978



Paragon
Reporting
Services
Certified Shorthand Reporters

210 North Fourth Street, Suite 205
San Jose, CA 95112-5569
        (408) 295-8301
        (800) 590-9958
Fax: (408) 295-4544
Paragoncsr@aol.com

**CERTIFIED COPY**

1    Q.   Absolutely.

2         (Recess taken.)

3         MR. KALLIS:   I am going to quickly search for a

4    2008 or 2009 version.

5         THE WITNESS:   We were just talking about that.

6         MR. KALLIS:   There have been some changes.

7         MR. FOX:   Hang on one second.   I think you want

8    to make sure it is the date that the incident was.

9         MR. KALLIS:   November 5th, 2007; right?

10        MR. FOX:   Right.   So you want a 2007 code.

11        MR. KALLIS:   2007 or 2008.   The closer I can

12   get to the date is the better.

13        MR. FOX:   Proceed at your peril.

14        (Recess taken.)

15        MR. KALLIS:   Would you be kind enough to mark

16   this as 34.

17        (LexisNexis Code section 8102 marked

18   Plaintiffs' Exhibit 34 for identification.)

19        MR. FOX:   Let's go off the record for a second,

20   if that's okay.

21        MR. KALLIS:   Sure.

22        (Discussion off the record.)

23        MR. FOX:   Let's go back on the record.

24   Q.   (By Mr. Kallis):   Captain, would you be kind

25   enough.   You said you wanted to review 8102.

                                                      42

1      A.  I am assuming we are focusing on section (a)

2  and not the rest of it?

3      Q.  We will start with section (a).  I think that's

4  probably a good idea.

5      A.  Okay.  Go ahead.

6      Q.  Okay.  Having read that, what is your

7  understanding of the provisions of that section for the

8  purpose of confiscating weapons from a person who has

9  been detained under a 5150?

10     A.  Well, the code in here says -- talks about,

11  um -- well, I will just read it.

12         "Whenever a person is" --

13     Q.  Read it slowly because the court reporter can't

14  keep up with you.

15     A.  Sorry.

16         MR. FOX:  You have to keep her happy, otherwise

17  we are all in big trouble.

18         THE WITNESS:  Yeah, got it.

19         "Whenever a person who has been detained or

20  apprehended for examination of his or her mental

21  condition or who is a person described in Section 8100

22  or 8103 is found to own, have in his or her possession

23  or under his or her control any firearm whatsoever, or

24  any other deadly weapon, the firearm or other deadly

25  weapon shall be confiscated by any law enforcement

43

Paragon Reporting Services (408) 295-8301

1     Q.  Constitution of the United States has a warrant

2  requirement, doesn't it?

3     A.  I am not sure how that -- I am not --

4     Q.  Fourth Amendment of the United States?

5     A.  Yes.

6     Q.  The Courts have created certain very defined

7  exceptions to the warrant requirement; correct?

8     A.  Correct.

9     Q.  And unless those defined exceptions exist, the

10  warrant requirement has to be fulfilled; is that

11  correct?

12     MR. FOX:  The question is argumentative and

13  vague as to what you mean by "defined exceptions."

14     Q.  (By Mr. Kallis):  Those exceptions set forth by

15  the Supreme Court, hot pursuit, et cetera.

16     A.  Right.  There are exceptions.

17     Q.  Does this law 8102 section (a) say that an

18  officer does not have to comply with the Fourth

19  Amendment and California Constitution warrant

20  requirements?

21     MR. FOX:  Literally asking you, does the

22  section say that?

23     THE WITNESS:  No, it does not.

24     Q.  (By Mr. Kallis):  Have you received any advice

25  from the Attorney General's office, not you personally,

45

Cole v. City of Sunnyvale       Kelly Fitzgerald, April 14, 2011

1    but your department, or any other attorney that stated

2    this provision 8102(a) does not require a warrant?

3        A.   I am not aware of anything from the

4    Attorney General's office.  I may have had a discussion

5    with our city attorney's office about this section and

6    this case at some point.

7        Q.   Okay.  But it would have been after the case

8    occurred?

9        A.   Correct.  Yeah.

10       Q.   I don't want to know what the communication

11   was.

12       A.   Right.

13       Q.   The fact that it was after --

14       A.   Yes.

15       Q.   -- is fine.

16            So is it your position that 8102 required that

17   the officers search the home?

18       A.   I believe it was reasonable for the safety of

19   all involved for the officers to search the home.

20            MR. FOX:  Pursuant to this section?

21            THE WITNESS:  Correct.

22       Q.   (By Mr. Kallis):  This section doesn't talk

23   about safety, does it?

24       A.   It does not use the word "safety."

25       Q.   And it doesn't talk about officer safety issue,

                                                        46

1   does it?  It says, shall -- a person on a 72-hour hold

2   who owns or possessions or controls firearms, the

3   officers shall confiscate the firearms; correct?

4       A.  Correct.

5       Q.  It doesn't say when the confiscation is to

6   occur; does it?

7       A.  No.

8       Q.  It doesn't say how it is to occur, does it?

9       A.  No.

10      Q.  And it doesn't say it is to occur without a

11  warrant?

12      A.  No.

13      Q.  Okay.  But it is your position that this still

14  does mandate that they confiscate them in some way, form

15  or time?

16      A.  Yes.

17      Q.  Okay.  Do you have any belief that there is

18  another section that requires them to do so concurrent

19  with taking the person in?

20      A.  Not that I am aware of at the moment.

21      Q.  And would your knowledge at the moment have

22  been the same knowledge basically of your officers?

23          MR. FOX:  We are talking about at the time of

24  this incident?

25          MR. KALLIS:  At the time of the incident.

47

```
 1              MR. FOX:  Yes.  To the extent it calls for you

 2    to speculate as to what they specifically know.

 3              THE WITNESS:  Yeah, it is too difficult to

 4    answer what the officers knew or didn't know.

 5              MR. KALLIS:  Okay.

 6         Q.  (By Mr. Kallis):  Did the department have a

 7    training policy --

 8         A.  The --

 9         Q.  -- where it trained its officers?

10         A.  We have, uh, several -- we have a training unit

11    that oversees training and mandates training for the

12    department.

13         Q.  Okay.  Are you aware that hundreds of 5150

14    arrests are made each year by your department?  Let me

15    rephrase that.  That's an incorrect statement.  Hundreds

16    of 5150 detentions --

17         A.  Detentions.

18         Q.  -- are made?

19         A.  That sounds like a reasonable number.

20         Q.  So it is something that your officers deal with

21    all the time?

22         A.  On a daily basis, yes.

23         Q.  And do you train your officers on the laws and

24    rules and procedures they are to follow in making a 5150

25    detention?
```

48

Paragon Reporting Services (408) 295-8301

1    A.  I have not worked in the training unit or

2  overseen the training unit, so I would be more

3  comfortable with us looking at training records

4  answering that question versus trying to answer it

5  myself.

6    Q.  Have you been trained in the past while you

7  were a lieutenant or a captain on 5150 procedures,

8  policies and laws?

9    A.  I don't recall.

10    Grab a water from over here.

11    Q.  Sure.  Please.  Have two.  This may help you a

12  bit.

13    I am looking at Exhibit -- looks like 27.

14  Exhibit 27 to the deposition of Lieutenant Hern.  I

15  believe you will find there Lieutenant Hern's training

16  records.

17    And at the same time I am going to give you

18  Exhibit 10 and 10-A from Officer Rocheville's

19  deposition.  (Handing.)  Will that assist you?

20    MR. FOX:  What is the question?

21    Q.  (By Mr. Kallis):  In determining if there has

22  been training on 5150.

23    A.  I am reluctant to testify on training.  I have

24  never worked in the training division or overseen the

25  training division.  Again, I think someone from the

49

Cole v. City of Sunnyvale          Kelly Fitzgerald, April 14, 2011

1   training unit should be here to -- to read these records

2   and answer your questions regarding training.

3        Q.  I understand.

4        A.  I think that's the best way to get to where you

5   are trying to go.

6        Q.  You just said you would have to look at the

7   training records to know if you were trained.  To help

8   you and assist you, I am providing training records.  If

9   that doesn't provide you any help or assistance after

10  you have looked at them, please tell me.

11       A.  All it is going to tell me is, if I can find it

12  in here, when it occurred.  That would be the only

13  thing.  Assuming I can decipher the abbreviations,

14  et cetera.  Again, I am not comfortable.

15       Q.  Fair enough.  Then we won't have you do it.

16       A.  I -- I am not trying to be -- give you a hard

17  time.  I think someone in the training unit could better

18  answer your questions and knows the paperwork,

19  et cetera.

20       Q.  If you are really uncomfortable about it, then

21  you would be guessing and speculating about it, and I

22  don't want that, so --

23       A.  Yeah.

24       Q.  Now, I believe that you also wrote a report to

25  Deputy Chief Strivers; is that correct?

                                                          50

1   Q.   And do you recall hearing on the tape that he

2   had a stable girlfriend and two children he lives with

3   and the kids are -- well, with the kids, eight and

4   12 years old?

5   A.   I don't recall hearing that on the tape.

6   Q.   Okay.  Did you recall hearing anywhere on the

7   tape where there was any indication from anyone that

8   Mr. Cole was a threat to anyone in the house?

9   A.   I don't recall.

10   Q.   Do you recall in listening to the tape and

11   having reviewed the CAD log whether or not Nancy Cole

12   said that she was in imminent fear or immediate fear for

13   her safety?

14   A.   I don't recall that type of specifics.  Only

15   the overall tone of she felt threatened or concerned.

16   Q.   For a 5150 for the purposes of a threat to

17   others, are there any restrictions on that threat?  Let

18   me explain.  That's not a good --

19   A.   Yeah, I --

20   Q.   For example, I call my mother and she is in

21   Florida.

22   A.   Right.

23   Q.   And I say to her, mom, things are going to be

24   really different tomorrow.  And by the way, I am so mad

25   at you, I could kill you.  Okay?

                                                        55

1      A.  All right.

2      Q.  Would that be -- if an officer overheard that

3  through a window, and he knows that I called Florida --

4      A.  Right.

5      Q.  -- just make that assumption?

6      A.  Yeah.

7      Q.  Would that be sufficient enough for a 5150?

8      A.  Again, not being there and not knowing all of

9  the circumstances, I -- based on what you are giving me,

10  I don't think that would be reasonable --

11      Q.  Okay.

12      A.  -- because of distance, the tone of the

13  conversation may have something to do with it,

14  et cetera.  Again.

15      Q.  If the person is 10, 15, 20 miles away, does

16  that change it in terms of being imminent or real

17  threat?

18      A.  I think certainly as opposed to your example

19  where the person is in Florida where it could take a day

20  or more to get there, you know, so -- versus drive

21  15 miles.

22      Q.  Okay.  So would it be fair for me to say that

23  for the policy and procedures, as you understand them

24  relating to 5150s in the department in 2007, that it

25  didn't matter whether the threat could be carried out

56

1    imminently or whether it took an hour or two to carry

2    out, if the threat was made or could have been perceived

3    as being made as a threat, that would be sufficient for

4    a 5150?

5           A.  Could you read that one back to me.

6           THE REPORTER:  "Question:  So would it be fair

7    for me to say that for the policy and procedures, as you

8    understand them relating to 5150s in the department in

9    2007, that it didn't matter whether the threat could be

10   carried out imminently or whether it took an hour or two

11   to carry out, if the threat was made or could have been

12   perceived as being made as a threat, that would be

13   sufficient for a 5150?"

14          MR. FOX:  Just for the record, by "imminent"

15   you mean within a minute?

16          THE WITNESS:  Yeah, and I think that's --

17          Q.  (By Mr. Kallis):  Imminent to me means

18   within -- that someone could carry it out within a very

19   short period of time versus --

20          MR. FOX:  An hour?

21          Q.  (By Mr. Kallis):  Let's use the same standard

22   as assault.

23          Does it have to be the same standard as an

24   assault; in other words, a threat that can be carried

25   out at the time?  Is there a longer time period?  Or

57

1    what?

2          A.  I think it is -- it is based on the

3    circumstances.  You can't -- I am not aware of anything

4    that tells us specifically, well, if they are over -- if

5    it is going to take 20 minutes, then it probably doesn't

6    apply.  If they live 50 miles away, it doesn't apply.

7          Again, I think it is what the officers -- the

8    totality of the circumstances and what they think is

9    reasonable at the time.

10         Q.  Given that Mr. Cole was sitting in his garage

11   on the telephone at the time the officers overheard this

12   in the privacy of his home, and his mother was up in the

13   Los Gatos mountains in Santa Cruz County, would you

14   consider that to be something that would justify a

15   5150 -- given everything you have read, okay, a 5150 on

16   Mr. Cole at that time?

17         A.  I am not comfortable answering that because it

18   is too limited.  The officers are having some kind of

19   conversation with him.  They are viewing his actions.

20   And I think it is a totality of circumstances,

21   observations that leads them to the decision they make.

22         Q.  Based upon the information that you have and

23   based on the information that you used to write your

24   letter to both Mark Stivers --

25         A.  Stivers.

                                                        58

1          MR. CHETCUTI:  She has child care, and she is

2     coming from Santa Cruz area.

3          MR. KALLIS:  I think I will be done here by

4     12:00.

5          MR. FOX:  She is scheduled for 2:30.  Shall we

6     say 2:00 or 1:30?

7          MR. KALLIS:  I think we should go 1:30.

8          MR. FOX:  Thank you.

9          (Recess taken.)

10          (Application for 72-hour Detention for

11     Evaluation and Treatment marked Plaintiffs' Exhibit 36

12     for identification.)

13     Q.  (By Mr. Kallis):  Deputy Chief, you are

14     allowing us to complete our record here, which is just

15     wonderful.

16     A.  Okay.  Reading this one is going to be a

17     challenge.

18     Q.  Before you read it, I want to ask you one or

19     two quick questions.

20     A.  Oh, okay.

21     Q.  For a 5150, can you set forth a list for me of

22     the generic criteria that are required to bring someone

23     in?  When I say that, I understand that a threat to

24     himself.  For example, if you fine-tune that criteria.

25     But I wanted to get more specific.

                                                        63

1          What would be the parameters of a threat that

2     would cause someone to say yes, this is a valid threat?

3     Can you do that or is that impossible?

4          A.  That's just too difficult to do, because each

5     circumstance can be so different.  And what you have

6     been told, what you have seen, where you are at, all

7     could play into this.  That would be too difficult to

8     do.

9          Q.  Okay.  Will you take a look at what has been

10    marked as 36.  And take a second and read it.

11          (Pause in the proceedings.)

12          MR. KALLIS:  Did I give you guys copies?

13          MR. FOX:  No.  Thank you.

14          THE WITNESS:  Okay.

15          MR. KALLIS:  Okay.

16          Q.  (By Mr. Kallis):  I would like you to take a

17    look, if you would, at the first paragraph, the above

18    person's condition.

19          Do you see that paragraph?

20          A.  Yes.

21          Q.  Okay.  And I would like you to read it, and I

22    would like you to tell me if there is anything in there,

23    in that first paragraph that you read that is a threat

24    to Nancy Cole.

25          A.  So you want me to read it out loud?

                                                          64

1      A.  I don't recall.

2      Q.  -- would that have had any impact on your

3    evaluation?

4      A.  No.

5      Q.  Now, getting back to the welfare check of the

6    premises.

7          Based on the information, the probable cause

8    document, and based on the information that you

9    reviewed, what facts led you to believe that there was a

10   likelihood that someone in the house was injured or

11   needed assistance?

12     A.  I think it is reasonable if the officers are

13   there because someone has been threatened or feels they

14   were threatened when they have placed on -- someone on a

15   72-hour hold to check on everyone at the residence and

16   confirm that they are all right.

17         The last thing you would want to do is leave

18   and then find out later someone had been injured and you

19   didn't render aid.

20     Q.  So any time someone is taken out with a 72-hour

21   hold for having made a threat, is it your position that

22   it is appropriate then to do a welfare check at the

23   house?

24     A.  I am uncomfortable with the term "any time."

25   Again, it is the circumstances of the case, what the

72

Paragon Reporting Services (408) 295-8301

1    officers are seeing, what they are doing, what they are

2    hearing, to make that judgment.

3        Q.   Once the welfare check was done, do you believe

4    that it was then -- Mr. Cole was in handcuffs in a

5    police car, do you believe it was appropriate at that

6    point to have searched the drawers and under the beds

7    for a shotgun?

8        A.   I want to be --

9        MR. FOX:   Shotgun?

10       THE WITNESS:   I want to be careful about that.

11   I am not sure whether he was in handcuffs, whether he

12   was in a patrol car, what the timeline was in terms of

13   the search.   Maybe I indicated it in here.   I don't

14   recall.

15       But I believe it is reasonable for them to look

16   for a gun, which I believe he had a gun registered to

17   him or at least that was the information the officers

18   had at the time, based on the 72-hour hold.

19       Q.   (By Mr. Kallis):   Even after Ms. Oberg said

20   there are no guns in the house?

21       A.   Correct.   I think it is reasonable.

22       Q.   Okay.   What about did you ever care or learn

23   any information concerning how Ms. Oberg got from her

24   bedroom to the garage?

25       A.   I don't recall.

73

Paragon Reporting Services (408) 295-8301

1        I, Terry deDiego, a Certified Shorthand

2   Reporter in and for the State of California, hereby

3   certify that the witness in the foregoing deposition,

4              KELLY FITZGERALD,

5   was by me duly sworn to tell the truth, the whole truth

6   and nothing but the truth in the within-entitled cause;

7   that the foregoing is a full, true and correct

8   transcript of the proceedings had at the taking said

9   deposition to the best of my ability.

10

11       DATE: April 27, 2011

12

13       _____

14       Terry deDiego

         CSR License No. 8978

15

16

17

18

19

20

21

22

23

24

25                                                    79

Cole v. City of Sunnyvale          Kelly Fitzgerald, April 14, 2011