M. Jeffery Kallis, SBN 190028
**THE LAW FIRM OF KALLIS & ASSOCIATES, P.C.**
333 W. San Carlos St., 8th Floor
San Jose, CA 95110
Telephone: (408) 971-4655
Facsimile: (408) 971-4644
M_J_Kallis @Kallislaw.org

Andrew V. Stearns, SBN 164849
Steven M. Berki, SBN 245426
Gaurav D. Sharma, SBN 269123
**BUSTAMANTE, O'HARA & GAGLIASSO, P.C.**
333 W. San Carlos St., 8th Floor
San Jose, California  95110
Telephone: (408) 977-1911
Facsimile: (408) 977-0746
astearns@boglawyers.com
sberki@boglawyers.com

Attorneys for Plaintiffs
Russell Cole and Stephanie Oberg

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **RUSSELL COLE**, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> **CITY OF SUNNYVALE**, et al., <br><br> Defendants. | Case No. C-08-05017 PVT <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT.** <br> [*Federal Rule of Civil Procedure § 56*]. <br><br> Hearing Date: June 17, 2011 <br> District Judge: Hon. Ronald Whyte <br> Time:  9:00 a.m. <br> Dept.: Courtroom 6, 4th Floor <br> Complaint Filed: November 4, 2008 |

//

TABLE OF CONTENTS

I. INTRODUCTION. ........................................................................................................... 1

II. DEFENDANTS' OPPOSITION PRESENTS SEVERAL PROCEDURAL AND EVIDENTIARY HURDLES WHICH INEVITABLY RESULT IN JUDGMENT IN PLAINTIFFS' FAVOR. ........................... 1

III. DEFENDANTS FAILED TO IDENTIFY ANY MATERIAL FACTS IN DISPUTE. ....................... 2

IV. DEFENDANTS ARE INCORRECT IN ARGUING THAT THE CALIFORNIA SUPREME COURT'S ORDER TO GRANT CERTIORI HAS NO BEARING ON THIS CASE. ............................................. 7

V. § 8102 IS NOT AN EXCEPTION TO THE WARRANT REQUIREMENT AS PRESCRIBED BY THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION. ....................................... 9

VI. THERE IS NO CATCH-ALL EXCEPTION FOR OFFICERS RELYING SOLELY ON HUNCHES AND CONJECTURE. ..................................................................................................................... 9

    A. COMMUNITY CARETAKER EXCEPTION IS SPECIFIC AND NARROW. ............................. 10

    B. EMERGENCY AID EXCEPTION IS INAPPLICABLE. ........................................................ 11

VII. QUALIFIED IMMUNITY IS NOT AVAILABLE. ............................................................... 13

VIII. DEFENDANTS MAKE NO ARGUMENT AS TO PLAINTIFFS' STATE LAW CLAIMS AND THUS HAVE FAILED TO SHIFT THE BURDEN TO PLAINTIFFS. ........................................................ 14

    A. DEFENDANTS ARGUMENTS ON § 52.1 DO NOT ADDRESS PLAINTIFFS' CLAIMS. ......... 14

IX. CONCLUSION. ........................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Allen v. McMurray.* 449 U.S. 96 (1980) ......................................................................................8

*Ayers v. City of Richmond,* 895 F.2d 1267, 1271 (9th Cir. 1990) ..................................................8

*Benas v. Baca,* 159 Fed. Appx. 762 (9th Cir. Cal. 2005) ...............................................................12

*Brigham City v. Stuart* 547 U.S. 398, 403 (2006) ........................................................................10

*Calbretta v. Floyd,* 189 F.3d 808 (9th Cir. 1999) ..........................................................................11

*Hopkins v. Bonvinco,* 573 F.3d 763, 772 (9th Cir. 2010) .............................................................14

*Huff v. City of Burbank,* 632 F.3d 539, 544 (9th Cir. 2011) ............................................ 10, 11, 12

*Kentucky v. King,* 179 L.Ed 865, 874 (2011) ................................................................................10

*McGowen v. City of San Diego,* 208 Cal. App. 3d 890 (1989) ......................................................8

*Miller v. Superior Court* 214 Cal. Rptr. 125 (1985) ......................................................................8

*Moreno v. Town Los Gatos,* 267 Fed. Appx. 665, 666 (9th Cir. 2008) .........................................15

*Rupf v. Yan,* 85 Cal. App. 4th 411, 422 (2000) ...............................................................................9

*Schmier v. Supreme Court* 2000 Cal. App. 1st Dist. (2000) ..........................................................8

*United States v. Cervantes,* 219 F.3d 882, 888 (9th Cir. 2000) ....................................................11

*United States v. Stafford,* 416 F.3d 1068, 1074 (9th Cir. 2005) ...................................................12

*United States v. Struckman* 603 F.3d 731, 738 (9th Cir. 2010) ....................................................11

*United States v. U.S. Dist. Court,* 407 U.S. 297, 313 (1972) .......................................................10

*Warner v. County of San Diego,* 2011 U.S. Dist. LEXIS 14312 (S.D. Cal. 2011) .......................15

*Welsh v. Wisconsin,* 466 U.S. 740, 749-50 (1984) .......................................................................11

**Statutes**

Cal. Civ. Code § 52.1(a) ................................................................................................................15

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT. [*FEDERAL RULE OF CIVIL PROCEDURE § 56*].


California Rule of Court § 8.1125(d) .................................................................................................7

Page iv

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT. [*FEDERAL RULE OF CIVIL PROCEDURE § 56*].

## I. INTRODUCTION.

Plaintiffs Russell Cole and Stephanie Oberg[1] hereby submit the following Reply in Support of Motion for Partial Summary Judgment (hereinafter referred to as the "*Reply*"). [ECF Docket No. 119]. Plaintiffs' *Reply* demonstrates that even when viewing the facts in the light most favorable to defendants, partial judgment as a matter of law is proper as a result of defendants' failure to place in dispute any material facts or issues. Moreover, as a matter of law, plaintiffs are entitled to partial judgment since an objective, rather than subjective view of defendants' actions, obviates reasonableness and immunity.

Specifically, plaintiffs identify that defendants' Opposition to plaintiffs' *Motion* (hereinafter "*Opposition*") [ECF Docket No. 123] fails to articulate any material factual dispute. Defendants do not analyze plaintiffs' version of facts with the applicable law. Failure to precisely view the relevant facts through the prism of relevant law results in something less than the standard for defeating a Motion for Summary Judgment. Most importantly, when viewing the facts as defendants present them, albeit as presented previously, the actions taken by defendants are illogical, inconsistent with well-established law and unnecessary under the circumstances. Neither defendants' allegations, viewed as true, nor the evidence in support of their *Opposition*, viewed in the light most favorable to defendants, raise a question of fact as to whether they acted unreasonably by failing to even consider the Fourth Amendment's warrant requirement prior to entering plaintiffs' home and detaining Oberg. For these reasons, plaintiffs are entitled to partial judgment[2].

## II. DEFENDANTS' OPPOSITION PRESENTS SEVERAL PROCEDURAL AND EVIDENTIARY HURDLES WHICH INEVITABLY RESULT IN JUDGMENT IN PLAINTIFFS' FAVOR.

Prior to engaging in a discussion of the limited arguments defendants raised by way of the *Opposition*, plaintiffs highlight that vast portions of defendants' filing quite simply are copied from *Defendants' Motion for Summary Judgment*[3] (hereinafter "*Defendants' Motion*").

---

[1] Hereinafter referred to individually as "Cole" and "Oberg" and collectively referred to as "plaintiffs."

[2] Plaintiffs' claims for partial judgment are for the Fourth Amendment violation as to Cole as well as Oberg. Plaintiffs chart erroneously identifies only Oberg as bringing this claim. However, the body of the document identifies plaintiff[s] and Oberg and Cole.

[3] Motion 8:11-9:9, same Opposition 8:11-9:9; Motion 9:23-29, same 9:22-28; Motion 10:3-

Page 1

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT. [*FEDERAL RULE OF CIVIL PROCEDURE § 56*].

1  [ECF Docket No. 111].  Plaintiffs identify below and in footnote 2, as necessary, those sections
2  which are taken verbatim from *Defendants' Motion for Summary Judgment*.  Upon first glance,
3  such a tactic [verbatim replication from a previous motion] results in defendants' failure to
4  scrutinize the arguments presented through plaintiffs' *Motion* and reliance on facts irrelevant
5  to the focused relief sought by the *Motion*.  However, through closer examination, defendants'
6  cavalier reorganization of arguments and recitation of previously-stated facts procedurally
7  results in the granting of Plaintiffs' *Motion* or the defeat of their own Motion.  It is impossible
8  to claim that an identical version of facts is disputed in one instance and undisputed in
9  another.  Because defendants failed to present a disputed material fact, mainly because
10 plaintiffs' facts were taken directly from defendants' testimony, *Motion for Partial Summary*
11 *Judgment* in plaintiffs' favor is required[4].

### III.  DEFENDANTS FAILED TO IDENTIFY ANY MATERIAL FACTS IN DISPUTE.

Plaintiffs anticipate significant disagreement concerning the facts in dispute and which facts are material to resolution of the prospective motions.  It is difficult to identify precisely which facts defendants argue are in dispute, if any.  The reason for this difficulty is that defendants copy verbatim their statement of facts from their *Motion for Summary Judgment* – *Defendants' Motion p. 2:8-7:9* are identical to *Defendants' Opposition p. 1:20-6:7*. Notwithstanding this conflict, there are significant issues which are not in dispute based on defendants' own testimony, including but not limited to, the following: (1) the information known to officers at the time – those factually supportable, and those negligently provided to officers by dispatch – did not justify a welfare check and/or a § 5150 detention of plaintiff; (2) Nancy Cole's call to Sunnyvale dispatch dealt solely with her fear of her son arriving at her house and nothing to do with violence at plaintiffs' home; (3) defendants did not obtain

---

11:13, same 10:6-25; Motion 14:3-15:22, same Opposition 14:6-15:26; Motion 11:19-12:9, same Opposition 15:1-16:18; Motion 12:9-13:5, same Opposition 17:24-18:22; Motion 15:24-16:9, same Opposition 20:7-20; Motion 16:11-18:23, same Opposition 20:22-23:1; Motion 21:27-22:4, same Opposition 23:19-24; Motion 22:14-15, same Opposition 23:26-27; Motion 22:17-23:8, same Opposition 24:1-21; and Motion 25:7-21, same Opposition 25:2-16.
[4] Plaintiffs also incorporate by reference the Objections to defendants' evidence as provided in the Opposition to Defendants' Motion. [ECF Docket No. 124].

consent prior to entry into plaintiffs' garage; (4) defendants could not accurately rely on the out-of-context information obtained from surveillance in the driveway since they were unaware with whom Cole was speaking; (5) officers admit they had no articulable facts that Cole was a danger to himself or others and whether he owned or possessed a shotgun was reasonable; and (6) officers had no information which could logically justify their hunch that a person within the home was injured or in need of immediate aid.

To highlight the misleading nature of defendants' statement of facts, plaintiffs underscore that the *Opposition* states "the conversation was heated and Cole and his mother began arguing, yelling and speaking in loud elevated tones." *Opposition, p. 2:12-13*. However, defendant Rocheville's testimony provides the exact opposite assessment that Cole was not yelling. It is equally true that they had no idea whether Nancy Cole was yelling since they could not hear the person on the other end of the telephone call.

Officer Rocheville's testimony was as follows:

```
                        113
24   Q. Was Mr. Cole screaming at the top of his lungs?
25   A. Um, not that I recall.
                        114
 1   Q. Normal tone of voice?
 2   A. Um....
[discussion by Counsel]
10   A. Yeah. I recall being slightly louder than a
11   conversational tone that we are speaking in now because
12   I could hear it from, you know, outside of the house
13   somewhere in the driveway.
14       So -- but it definitely was not an at the top
15   of your lungs yell.
16   Q. Would you call it screaming?
17   A. No, I wouldn't classify it as that.
18   Q. Would you call it yelling?
19   A. I wouldn't classify it as that.
20   Q. So it was loud talking?
21   A. Yes.
```
*See Dec. of Stearns, Ex. A.*

Defendants' statements of fact in their filings state the exact opposite of what the officers themselves claim under oath. This is not the only instance where this is the case. Accordingly, defendants' facts must be scrutinized for accuracy. For example, defendants

assert that Cole was a harm to himself or others and that defendants had information that a person or persons in the home may have been in need of assistance. However, defendants own deposition testimony rebuts these facts. The following testimony with citations and analysis are provided[5]:

Defendant Rocheville on whether anyone was injured:

```
                              149
 6   Q. Okay. So some point of time passed, and
 7  Ms. Cole came out of the house into the garage.
 8      Tell me what transpired during the period of
 9  time from when Mr. Cole was cuffed to the point where
10  Ms. Oberg comes out....
14      THE WITNESS: Okay. So, um, after we -- after
15  Mr. Cole was detained, um, and we learned that he lived
16  in the residence with, um, Ms. Oberg and two children,
17  um, Mr. Cole again was not -- was not answering
18  questions.
19      We were concerned for the welfare of the
20  residents. We wanted to do a welfare check to make sure
21  everything was okay inside the house. Um.
22   Q. (By Mr. Kallis): Did you have any indication
23  that anybody was not okay? That's a double negative.
24      Was there any indication that someone was not
25  okay?
                              150
 1   A. I had no direct knowledge that somebody was --
 2   Q. Did you have indirect knowledge that anybody
 3  was injured?
 4   A. Um, no.
 5   Q. Were you aware of things being out of place?
 6  In other words, did it look like there had been a fight
 7  or things had been pushed over or turned over?
 8   A. Um, where specifically?
 9   Q. Whatever part of the house you saw.
10   A. Okay. Um, when we made the determination to do
11  the welfare check, we were just inside of the garage.
12  We didn't have a view inside the house. So I -- so I
13  didn't see specifically what the house looked like.

                              136
 7   Q. You previously responded that in terms of the
```

---

[5] Plaintiffs also incorporate by reference the Statement of Facts and testimony provided by way of plaintiffs Opposition to Defendants' Motion for Summary Judgment. [ECF Docket No. 124, p. 2:16-8:11].

Page 4

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT. [FEDERAL RULE OF CIVIL PROCEDURE § 56].

```
 8  5150 that he was taking Xanax. Okay? And I am trying
 9  to clarify that issue.
10       MR. KALLIS: With that in mind, would you
11  please read back the preceding question.
12       THE REPORTER: "Question: So is it your belief
13  at the time or was it your belief at the time that the
14  taking of Xanax for anxiety constitutes a psychological
15  impediment that would make him an imminent danger to
16  himself and others?"
17       THE WITNESS: Um, okay. I believe that the
18  fact that he took Xanax for anxiety coupled with his
19  making a threatening comment to his mother, um,
20  qualified him to meet the terms, the conditions set
21  forth for 5150 of the Welfare and Institutions Code.
```
*See Dec. of Stearns, Ex. A.*

Defendant Cortese on whether anyone was injured:

```
                          51
10   Q. At the time that you arrived on the scene, the
11  subtotal of information that you had about this
12  situation was what is in the CAD report which we marked
13  as Exhibit 16 up until that point in time which you said
14  is more likely between 011 and 015; correct?
15     A. Correct.
16   Q. And at the time that you arrived on the scene,
17  there is nothing in the CAD report indicating that
18  anyone in the house was hurt; correct?
19     A. Correct.
20   Q. As far as being able to look into that front
21  window into the house, you didn't see what looked like
22  any hurt individuals; correct?
23     A. Correct.
24   Q. When you saw Mr. Cole through that front
25  window, he did not appear to be hurt, did he?
                          52
 1     A. Correct.
 2   Q. Prior to going to the garage, you also had no
 3  indication that anyone in the house was in need of any
 4  kind of medical attention; correct?
 5     A. That's an assumption. I don't know what's in
 6  there. I can only see the doorway in the kitchen area
 7  where it was lit. The rest of the house was all to the
 8  left, and there was a hallway and bedrooms we could not
 9  see into.
10   Q. Correct. That was the focus of the question.
11       You had no indication, you had no information
12  telling you that anybody in the house needed medical
13  attention at that point in time; correct?
```

```
14    A. There was nothing I saw that indicated that.
15    Q. And there was nothing you had heard from any
16  other source that indicated that either?
17    A. Correct.
18    Q. Again, based on the information you had
19  available to you at the time you arrived at the house,
20  there was no information indicating that Mr. Cole had
21  committed a crime at the time you arrived at the house;
22  correct?
23    A. Correct.
                          78
2     Q. My understanding from your testimony is you
3  detained him for a possible 5150.
4     A. Officer Rocheville.
5     Q. Officer Rocheville. I am talking about in
6  general what are the requirements to do that type of
7  retention. That's the only time I am talking about
8  anymore.
9     A. 5150 Code says the person is a danger to
10 themselves or others or disabled.
11    Q. As far as prior to Mr. Cole being handcuffed
12 and detained, what did you perceive as being a --
13 Mr. Cole being a danger to himself?
14    A. To himself?
15    Q. Yes.
16    A. No. See Dec. of Stearns, Ex. B.
```

Defendant Hern on whether anyone was injured:

```
                         125
4     Q. Do you see words in your policy that says that
5  you are allowed to do that without a warrant?
6     A. I do not see that in the policy.
7     Q. Do you see anywhere in the policy where it says
8  that you must immediately search the home?
9     A. I don't see that, no.
10    Q. Is there any other policy that you're aware of
11 that was in effect at that time the Sunnyvale Police
12 Department that was included in or part of the policy
13 for 5150s and 8102s?
14    A. I don't believe so.
15    Q. On what basis did you believe that the
16 immediate search of the home was authorized?
17    A. As part of our thorough investigation, and to
18 ensure the safety of Mr. Cole and any other persons in
19 the house, my belief is that we would have to do the
20 search to confiscate any weapons that we believed were
```

> 21  there or we knew were there for a fact.
> 22     Q. Did you know for a fact that there were weapons
> 23  there?
> 24     A. No, we did not.
> 25     Q. Let me see if I have this straight. Mr. Cole
>                           126
> 1  is in handcuffs with officers around him and/or about to
> 2  be transported to Valley Medical; is that correct?
> 3     A. Yes, sir.
> 4     Q. He has no way at this point of getting to any
> 5  of those guns, did he?
> 6     A. Not at that point.
> 7     Q. So if there were guns in the house at that
> 8  point, they were a danger -- as far as Mr. Cole is
> 9  concerned, they weren't a danger to anybody, were they?
> 10    A. At that moment, no. *See Dec. of Stearns, Ex. C.*

In sum, each defendant testified that prior entering the garage, prior to entering the home, and after Cole was handcuffed and detained under § 5150, no facts were present demonstrating that anyone was in need of immediate assistance.

### IV. DEFENDANTS ARE INCORRECT IN ARGUING THAT THE CALIFORNIA SUPREME COURT'S ORDER TO GRANT CERTIORI HAS NO BEARING ON THIS CASE.

Defendants provide California Rule of Court § 8.1125(d) (hereinafter "§ 8.1125) for the proposition that depublication means any analysis of the Court's decision cannot be performed. Unfortunately, § 8.1125(d) is inapplicable to this case. § 8.1125 is titled "***Requesting*** depublication of published decisions," while subsection (d) is named "Effect of Supreme Court ***order*** to depublish." *Cal. R. of Ct. § 8.1125*, (Emphasis added). These titles are helpful in showing the misdirection of defendants' argument. In this case, no party requested depublication. On the contrary, depublication was a result of the Court's granting Certiori and subsequent dismissal in response to the Legislature's amendment, not as the result of a depublication order. In sum, this section has no bearing on this case since the Supreme Court of California never entertained a request for depublication, nor did it issue an order for depublication.

In fact, the description by the Supreme Court provides the most articulate description of the Court's intent. The Court stated:

> Dismissed and remanded to Court of Appeal, Third Appellate District.
> In light of Assembly Bill No. 532 (2009-2010 Reg. Sess.), signed by the Governor

and chaptered by the Secretary of State on October 11, 2009 (see Stats. 2009, ch. 450), review in this matter is dismissed.
*People v. Travis Sweig*, 219 P.3d 152 (2009); 2009 Cal. LEXIS 12172

This statement cannot be taken lightly since the Court both dismissed the appeal of the public entity involved (an entity in privity with defendants) and remanded it to the Third District Court of Appeal. The Third District then remitted the case back to the Shasta County Superior Court which ended the case with its Order on the Motion to Suppress still in effect. This neutrality and consistent upholding of lower court's decision obviates defendants' publication argument.

Moreover, the rules concerning publication do not contravene the doctrine of *stare decisis*, which is a principal of judicial policy, not a rule of constitutional or statutory dimension. *Schmier v. Supreme Court* 2000 Cal. App. 1st Dist. (2000). Defendants' arguments as to publication are therefore incorrect. More to the point, defendants' are collaterally estopped from making such an argument.

In civil rights actions brought under §1983, state law governs whether collateral estoppel is applied to any prior state court judgments. *Allen v. McMurray.* 449 U.S. 96 (1980). In applying collateral estoppel, California requires (1) a serious offense that was fully litigated; (2) a full and fair trial; (3) the issue on which the prior conviction is offered must of necessity have been decided; (4) the decision in the former proceeding must be final and on the merits; and (5) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior trial. *Ayers v. City of Richmond*, 895 F.2d 1267, 1271 (9th Cir. 1990); *McGowen v. City of San Diego,* 208 Cal. App. 3d 890 (1989).

The case which forced the amendment of § 5150 and § 8102 is, in all manner and respects, identical to the case before this Court. Perhaps the only difference is that the *Sweig* case, involved a criminal Motion to Suppress for violation of the Constitution, while this matter involves its civil constitutional companion § 1983 claim. It should be noted that the plaintiffs and the defendants in the *Sweig* case are in privity with all parties in this case under the community of interest theory as the issues are identical. *Miller v. Superior Court* 214 Cal. Rptr. 125 (1985).

### V. § 8102 IS NOT AN EXCEPTION TO THE WARRANT REQUIREMENT AS PRESCRIBED BY THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

Defendants argue that "the language of § 8102...demonstat[es] that the Legislature intended to authorize a search and seizure **_without_** a warrant to accomplish the immediate removal of weapons from a detainee's control." *Opposition at 16:14-18.* (Emphasis added). Put another way, defendants argue that § 8102 is an exception to the warrant requirement. This argument is specious and ignores the well-founded provisions that all searches absent a warrant or warrant exception are patently unreasonable and constitutionally deficient.

In addition, defendants argue that the need to *immediately* search the home justifies the lack of a warrant. This argument is unfounded and fails to analyze what § 5150 accomplishes. Because a person detained and committed under § 5150 is held for a period of 72 hours and no longer has access to a weapon, the public agency has three (3) days to obtain a warrant and retrieve the firearms. It should also be noted that this period allows police to determine what address the firearm is registered to. In short, § 8102 does not allow what defendants still to this day assert – an exception to the warrant requirement.

Defendants lean heavily on the case of *Rupf v. Yan*, 85 Cal. App. 4th 411, 422 (2000). However, the only things in common between the case at bar and *Rupf* is a mere citation to § 8102. Although defendants cling to the ruling *Rupf* for alleged constitutional validity, a review of that case establishes that it is consistent with *Sweig* and agrees with its ruling. "As a practical matter, a weapon is subject to confiscation under this section *only when* there is an underlying emergency." *Id.* at 423. Thus, the exigency exception to the warrant requirement obviates a need for a warrant. In comparison, defendants have been unable to identify any emergency that necessitated entering the plaintiffs' home. Instead, defendants have specifically stated that it was not a specific fact, but rather a hunch which led them to believe that persons inside required *immediate* assistance. Defendants cannot merely enter the home based on the sole possibility that someone may be injured.

### VI. THERE IS NO CATCH-ALL EXCEPTION FOR OFFICERS RELYING SOLELY ON HUNCHES AND CONJECTURE.

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT. [*FEDERAL RULE OF CIVIL PROCEDURE § 56*].

Defendants argue that the Fourth Amendment is inapplicable in light of § 8102. This statement ignores and disrespects the importance and the sanctity of the protections provided to the home by the United States Constitution. "Physical entry into the home is 'the chief evil against which the wording of the Fourth Amendment is direct.'" *Huff v. City of Burbank*, 632 F.3d 539, 544 (9th Cir. 2011); quoting *United States v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972). As the United States Supreme Court has repeatedly reaffirmed, even as recently as this year, "[i]t is a 'basic principle of Fourth Amendment law,' we have often said, 'that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Kentucky v. King*, 179 L.Ed 865, 874 (2011); citing *Brigham City v. Stuart* 547 U.S. 398, 403 (2006). It is this aspect of defendants' actions that are particularly unlawful. Defendants went into plaintiffs' home in the middle of the night shining flashlights into rooms occupied by an innocent citizen and sleeping children. To casually assert that their actions are presumptively reasonable because § 8102 uses the word 'shall' is structurally dysfunctional. Because § 8102 does not specify when the weapon must be confiscated, it is incumbent on police to first consider getting a warrant – especially since **immediacy** is not referenced in the statute. In this case, as testified to by the officers, they did not even consider whether to get a warrant because it was their practice and understanding that § 8102 circumvented the warrant requirements of the Fourth Amendment. This philosophy is dangerous and requires acknowledgement of its incompatibility with established law.

### a. COMMUNITY CARETAKER EXCEPTION IS SPECIFIC AND NARROW.

"Without a search warrant, the search of a house is per se unreasonable, and absent exigency or consent, warrantless entry into the home is impermissible under the Fourth Amendment." *Huff, supra* at 544. The community caretaker exception is as limited as every other exception to the Fourth Amendment's stringent warrant requirement. Defendants morph this exception into one that qualifies for any justification conjured up by an officer regardless of its unreasonability. There exists, however, a narrow set of rigorously guarded exceptions to this warrant requirement. *See Cervantes, infra.*

The community caretaker exception, also known as the welfare exception,

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT. [*FEDERAL RULE OF CIVIL PROCEDURE § 56*].

encompasses a variety of community functions, including removal of vehicles that impede traffic and the inventory of impounded vehicles. However, this exception does not provide officers carte blanche to morph <u>after the fact</u> any search into one based on the welfare or safety when the factual scenario does not dictate the same. In fact, this function is predominately outside of criminal and investigative actions. Probable cause must be determined before and not after the illegal entry.

Defendants argue a similar argument to that of the officers in *United States v. Struckman* 603 F.3d 731, 738 (9th Cir. 2010) and *Calbretta v. Floyd*, 189 F.3d 808 (9th Cir. 1999) (defendants argument that the welfare of children invoked exigency exceptions rejected). Unfortunately, the consensual encounter/*Terry* analysis does not apply to searches of the home. *Struckman, supra* at 738. In this case, plaintiffs were not free to leave and their welfare was never in question. Surmising based on unsustainable and unreasonable criteria that a person may be injured within the home does not alleviate defendants' duty to responsibly develop and identify facts justifying an exception to the warrant requirement before entry.

### b. EMERGENCY AID EXCEPTION IS INAPPLICABLE.

The emergency doctrine, a subset of the welfare or community caretaker function allows officers to enter and secure premises, only when they have a reasonable basis to perceive an emergency. *United States v. Cervantes*, 219 F.3d 882, 888 (9th Cir. 2000). "[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Huff, supra* at 545; quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984). This exception may only be invoked when the party can satisfy the following: (1) the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property; (2) the search must not be primarily motivated by intent to arrest or seize evidence; and (3) there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched. *Id. at 888.* However, the "Government bears the burden of demonstrating that the search at issue meets these parameters...since this doctrine could be

abused to serve as a guise for warrantless, otherwise unreasonable entries." *United States v. Stafford*, 416 F.3d 1068, 1074 (9th Cir. 2005). When an officer lacks probable cause, so too does the officer lack exigency and thus, the need to search a residence disappears. *Benas v. Baca*, 159 Fed. Appx. 762 (9th Cir. Cal. 2005).

"In addition to exigency, officers must have probable cause." *Huff, supra* at 545. Moreover, "merely assert[ing] her right to end her conversation with the officers" does not a reasonable exigency make." *Huff,* supra at 547. This is exactly what Cole did by remaining silent and thus, an exigency in the house cannot be argued on this fact alone. "Cases in which the emergency exception validates warrantless entry typically involve an immediate need specifically associated with the home. *Benas, supra,* at 766. In this case, defendants' analysis of an exigency is tenuous at best. In fact, defendants were not even aware that any persons or weapons were actually in the home prior to entry.[6] As testified to by defendant Hern, the officers did not believe that a judge would have issued a search warrant under the totality of the circumstances in this case.

```
127
20  Q. And have you in the past received warrants that
21  you applied for?
22    A. Search warrants? Arrest warrants?
23    Q. Let's call search warrants.
24    A. Search warrants, I have not ever applied for a
25  search warrant.
128
1   Q. Do you know how to?
2     A. I know how to, yes.
3     Q. Is there a method for getting a search warrant
4   in the middle of the night?
5     A. There is guidelines and policies that we have
6   in place and a protocol to follow.
7     Q. So you can get a search warrant in the middle
8   of the night?
9     A. Yes.
10    Q. Could you have gotten a search warrant to
11  search Mr. Cole's residence?
12      MR. FOX: Calls for speculation.
13      MR. KALLIS: No. Could he have gotten one.
14      MR. FOX: You mean physically obtain the
```

---

[6] No weapons were in fact found in the home.

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT. [*FEDERAL RULE OF CIVIL PROCEDURE § 56*].

> 15  warrant?
> 16      MR. KALLIS: Going through the procedures to
> 17  get the warrant.
> 18      MR. FOX: If you're asking him if he could
> 19  perform the procedures, that's one thing. Whether or
> 20  not a judge is available is something else.
> 21      BY MR. KALLIS: Q. Could you have gone through
> 22  the procedures to get the warrant?
> 23  A. I could have, yes.
> 24  Q. And how long do you believe it would take to
> 25  get a telephonic warrant?
>                     129
> 1   A. For this case or in general?
> 2   Q. In general.
> 3   A. I have no idea.
> 4   Q. How about a telephonic arrest warrant? Have
> 5   you done that?
> 6   A. I have not done that.
> 7   Q. Do you think you could have gotten a search
> 8   warrant for the Cole residence within a few hours?
> 9       MR. FOX: Question is vague as to "few hours."
> 10      THE WITNESS: Between midnight and four o'clock
> 11  in the morning?
> 12      MR. KALLIS: That's more than a few, but sure
> 13  I'll go with midnight to four.
> 14      THE WITNESS: My personal belief is that a
> 15  judge would not have granted a search warrant for this
> 16  particular incident because of the facts in the case at
> 17  that time. *See Dec. of Stearns, Ex. C.*

This admission is fatal to any argument for a warrant exception and for a justification using § 8102 to search plaintiffs' home. The question must be asked, if defendants did not think a judge would grant a search warrant, what facts and/or exception allowed them to do what a judicial officer would not have found proper?

## VII. QUALIFIED IMMUNITY IS NOT AVAILABLE.

As to qualified immunity, defendants make no argument as to why the defendants' actions were reasonable. Defendants simply repeat their arguments previously made in their *Motion for Summary Judgment* (*Motion p. 16:11-18:23* identical to *Opposition p. 20:21-23:1*). The claim by defendants is that Oberg's brief detention was necessary. However, defendants' analysis ends there and they merely assert unsupportable conclusions. Absent from their

discussion is any reference to why the defendants' actions were reasonable. In fact, defendants go as far as to misstate the law by claiming that its reasonable to infer that "the Legislature, in enacting § 8102...created an exception to the warrant requirement." This statement is dangerous and ignores common police practice. It can also be said that such a precedent is damaging in that it rewards officers for not inquiring into whether an exception to the warrant requirement even exists. Moreover, defendants' own testimony provides that the statute does not establish that a warrant exception is present. *See testimony above.*

Defendants again misconstrue the clearly established right under qualified immunity. The clearly established right is not the right of the police to develop a statutory exception to the warrant requirement. The clearly established right is the Fourth Amendment right to be free from unreasonable searches and seizures. "We have explicitly stated that 'with respect to the lack of probable cause and the lack of exigent circumstances – the absence of either of which would preclude the officers' reliance on the exigency exception – the law as to both was clearly established in 2003." *Hopkins v. Bonvinco,* 573 F.3d 763, 772 (9th Cir. 2010).

Defendants do not touch this argument because to do so would result in an admission of the power of the Fourth Amendment's prohibition on warrantless searches and the supremacy of the U.S. Constitution over state statutes. Whether defendants' actions were reasonable and necessary is similarly not up for debate. As highlighted above, defendants were aware that a judge would not grant a search warrant, did not attempt to obtain one, but rather, relied on a slanted reading of a statute and Cole's invocation of his 5th Amendment rights as justification to search plaintiffs' home. This is beyond improper.

## VIII. DEFENDANTS MAKE NO ARGUMENT AS TO PLAINTIFFS' STATE LAW CLAIMS AND THUS HAVE FAILED TO SHIFT THE BURDEN TO PLAINTIFFS.

Defendants have failed to make any argument as to plaintiffs' state law claims. (*Defendants' Motion p. 2:8-7:9* are identical to *Defendants' Opposition p. 1:20-6:7*). Rather, defendants have in a repetitious and conclusory fashion stated that an element is not met. This vague argument does not allow them to meet their burden.

### a. DEFENDANTS ARGUMENTS ON § 52.1 DO NOT ADDRESS PLAINTIFFS' CLAIMS.

The Ninth Circuit has been adamant that § 52.1 does not require the outward existence

of violence or threat of violence as defendants profess:

> Reading section 52.1 on its own terms, as *Venegas* directs, the statutory language clearly requires only "threats, intimidation, or coercion." *Cal. Civ. Code § 52.1(a)*. Though the issue was not explicitly discussed in *Venegas*, the California Supreme Court there implicitly agreed with this position, holding that a plaintiff had stated a section 52.1 claim despite the fact that there was no allegation of violence beyond the unreasonable arrest and search, and consistently referring to section 52.1 as requiring "threats, intimidation, or coercion... *Venegas*, 32 Cal. 4th 843...our best interpretation of the law as it currently stands is that section 52.1 does not require violence or threat of violence. *Moreno v. Town Los Gatos*, 267 Fed. Appx. 665, 666 (9th Cir. 2008)

It is the height of irony for defendants to argue that the uninvited presence of an armed police officer in a person's darkened bedroom in the middle of the night is neither intimidatory nor coercive. Adding to these facts, the officers shined a flashlight in the face of someone who was asleep and told them to leave their bedroom and come into the kitchen, this is nothing short of offensive application of authority and coercive. *Warner v. County of San Diego*, 2011 U.S. Dist. LEXIS 14312 (S.D. Cal. 2011). ("The Court is not convinced that § 52.1 requires that there be threats, intimidation, or coercion beyond the unconstitutional use of force or unreasonable search or seizure."). Defendants have failed to shift the burden back to plaintiffs.

## IX. CONCLUSION.

Based on the foregoing, the plaintiffs' respectfully request that the Court grant plaintiffs' *Motion*. Plaintiff requests the Court determine that both are entitled to partial summary judgment on certain legal issues provided herein.

DATED: June 3, 2011    **THE LAW FIRM OF KALLIS & ASSOCIATES, P.C.**

By: /S/
M. JEFFERY KALLIS

DATED: June 3, 2011    **BUSTAMANTE, O'HARA & GAGLIASSO, PC**

By: /S/
ANDREW V. STEARNS
STEVEN M. BERKI
GAURAV D. SHARMA