1   M. Jeffery Kallis, SBN 190028
**THE LAW FIRM OF KALLIS & ASSOCIATES, P.C.**

2   333 W. San Carlos St., 8th Floor
San Jose, CA 95110

3   Telephone: (408) 971-4655
Facsimile: (408) 971-4644

4   M_J_Kallis @Kallislaw.org

5   Andrew V. Stearns, SBN 164849
Steven M. Berki, SBN 245426

6   Gaurav D. Sharma, SBN 269123
**BUSTAMANTE, O'HARA & GAGLIASSO, P.C.**

7   333 W. San Carlos St., 8th Floor
San Jose, California 95110

8   Telephone: (408) 977-1911
Facsimile: (408) 977-0746

9   astearns@boglawyers.com
sberki@boglawyers.com

10

11   Attorneys for Plaintiffs
Russell Cole and Stephanie Oberg

12

13                    **UNITED STATES DISTRICT COURT**

14            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15                        **SAN JOSE DIVISION**

16   **RUSSELL COLE**, et al.,         )  Case No. C-08-05017 RMW
                           )

17             Plaintiffs,       )
                           )  **DECLARATION OF ANDREW V.**

18   vs.                    )  **STEARNS IN SUPPORT OF PLAINTIFFS'**
                           )  **REPLY IN SUPPORT OF MOTION FOR**

19   **CITY OF SUNNYVALE**, et al.,     )  **PARTIAL SUMMARY JUDGMENT**
                           )

20            Defendants.     )
                           )

21                            )  Hearing Date:  June 17, 2011

22                            )  District Judge: Hon. Ronald Whyte
                           )  Time:  9:00 a.m.

23                            )  Dept.: Courtroom 6, 4th Floor
                           )  Complaint Filed: November 4, 2008

24

25       I, ANDREW V. STEARNS, declare as follows:

26       1.  I am an attorney with the law firm of Bustamante O'Hara & Gagliasso, co-counsel for

27   plaintiffs in this action, duly authorized to practice law before this Court and all courts in the

28

DECLARATION OF STEARNS IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1   State of California, and if called as a witness, I could testify competently to the following of my

2   own personal knowledge:

3       2.   Attached hereto as **Exhibit A,** and made a part hereof as though set forth in full herein,

4   is a true and correct copy of excerpts from the deposition of STEVEN ROCHEVILLE.

5
        3.   Attached hereto as **Exhibit B,** and made a part hereof as though set forth in full herein,
6
7   is a true and correct copy of excerpts from the deposition of TRACY HERN.

8       4.   Attached hereto as **Exhibit C,** and made a part hereof as though set forth in full herein,

9   is a true and correct copy of excerpts from the deposition of SCOTT CORTESE.

10      I declare under penalty of perjury under the laws of the United States of America and the

11  laws of the State of California that the foregoing is true and correct.

12      Executed this 3RD day of June 2011 in San Jose, California.

13

14

15                          By:_____/s/_____
16                              ANDREW V. STEARNS, CO-COUNSEL FOR PLAINTIFFS RUSSELL
                                COLE & STEPHANIE OBERG
17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

Paragon Reporting Services (408) 295-8301

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RUSSELL COLE, an individual; and
STEPHANIE OBERG, an individual,
     Plaintiffs,

  vs.                  No. C-08-05017 PVT

CITY OF SUNNYVALE, a municipal
corporation within the State of
California; BUREAU OF POLICE CHIEF
DON JOHNSON, in his individual and
official capacity; BUREAU OF
POLICE CAPTAIN KELLY FITZGERALD,
in his individual and official
capacity; BUREAU OF POLICE
LIEUTENANT TRACY HERN, in his
individual and official capacity;
BUREAU OF POLICE OFFICER STEVEN
ROCHEVILLE, in his individual and
official capacity; BUREAU OF
POLICE OFFICER SCOTT CORTESE, in
his individual and official
capacity; and DOES 1 through 10,
     Defendants.
_____/


DEPOSITION OF STEVEN ROCHEVILLE


Date:        Tuesday, March 8, 2011

Time:        10:23 a.m.

Location:     THE LAW FIRM OF KALLIS & ASSOCIATES
            333 West San Carlos Street
            8th Floor
            San Jose, CA 95112


Reported by:  TERRY deDIEGO
            Certified Shorthand Reporter
            License No. 8978

Paragon Reporting Services (408) 295-8301

Page 77

1    A.   Um, I was assigned to beat five which goes from
2    the western border of Sunnyvale in Mountain View, and it
3    extends from the El Camino south to Homestead Road and
4    then everything west from Fremont Avenue.
5    Q.   So the east boundary is Fremont?
6    A.   El Camino on the north.  Fremont Avenue on the
7    east.  Homestead Road on the south.  And then the City
8    of Mountain View on the west.
9    Q.   Okay.  And you have no recollection as to what
10   you were doing before actually 00:06:29 on the 6th of
11   November?
12   A.   That's correct.  Yes.
13   Q.   Let's go through the information that we have
14   here on the CAD printout.
15        MR. KALLIS:  And along with that I am going to
16   have marked as number 16 a packet of documents produced
17   by the city that are Bates-stamped 0087 through 00 I
18   think it is 93.  Yes, 93.
19        (Calls-For-Service Inquiry Response marked
20   Defendants' Exhibit 16 for identification.)
21   Q.   (By Mr. Kallis):  Have you ever seen these
22   before?
23        MR. FOX:  By "these," you mean Exhibit 16?
24        MR. KALLIS:  Let's start with this type of
25   document.

Cole v. City of Sunnyvale        Steven Rocheville, March 8, 2011

Paragon Reporting Services (408) 295-8301

Page 78

1          MR. FOX:  Okay.

2          THE WITNESS:  Never seen this specific

3     document, um, but familiar --

4          Q.   (By Mr. Kallis):  How about this type?

5          A.   Familiar would be the format of the contents is

6     similar to the format of Exhibit 15.  Just in a --

7          Q.   So this is just Exhibit 15 in a different

8     format?

9          A.   Um, that's what it would appear to be, yeah.

10         Q.   Okay.  If you need to refer to Exhibit 16,

11    please feel free.  We are going to run down Exhibit 15,

12    however.  But since they are related, I thought that I

13    would put them in so that they are available as we go

14    along.

15         The first message, timed 22:45:52 on the CAD

16    printout, at some point you read that; correct?

17         A.   Yes.

18         Q.   And did you read that prior to arriving at 849

19    Corvallis?

20         A.   Yes.

21         Q.   Okay.  Taking a look at it, is there anything

22    in that first paragraph that suggests to you that there

23    is a dangerous or hazardous situation?

24         A.   In that first entry only?

25         Q.   Yes.

Paragon Reporting Services (408) 295-8301

Page 79

1        A.   At 2245?

2        Q.   That's correct.

3        A.   No, there is nothing that suggests it, a

4   danger, any danger.

5        Q.   Okay.  Now, you go down to the next line which

6   is 22:46:30, and it says S-U-P-P.  What does S-U-P-P

7   stand for?

8        A.   To -- I couldn't tell you exactly.

9        Q.   Does it mean supplemental information?

10       A.   That would be my best guess, but I couldn't

11  tell you for certain.

12       Q.   I don't want you to guess, but if you think

13  that's what it is, you can tell me that that's what you

14  think it is.  If you don't know, you don't know.

15       A.   I don't know.  I don't know specifically.

16       Q.   And the text there says, "Help in Los Gatos.

17  When I asked if I could transfer him or give him a

18  Los Gatos number, he said no.  Subject sounds 5150 and

19  disconnected again."  Okay?  You read that?

20       A.   Yes.

21       Q.   What information did you know about the

22  dispatcher's ability to make a telephonic assessment of

23  a person's mental state?

24            MR. FOX:  The question is vague.

25       Q.   (By Mr. Kallis):  You can answer.

Cole v. City of Sunnyvale        Steven Rocheville, March 8, 2011

a21d93f4-5bca-4fe8-bdb0-3a137d64d9df

Paragon Reporting Services (408) 295-8301

Page 80

1    A.   Um, I have no specific knowledge about the
2    dispatcher's ability to do so.
3    Q.   Did the dispatcher explain to you over the
4    radio or in any other way what her basis for 5150 was?
5    A.   Um, not that I recall.
6    Q.   Okay.  Do you recall if when you first read
7    this, you contacted the dispatcher and asked for
8    information concerning the 5150 label?
9    A.   I don't recall.
10   Q.   Would looking at the CAD be helpful?
11   A.   Um.
12        MR. FOX:  Helpful for what purpose?
13        MR. KALLIS:  Refreshing his memory.
14        MR. FOX:  About calls dispatch?
15        MR. KALLIS:  To get more information.
16        MR. FOX:  Okay.  He has the CAD in his name.
17        MR. KALLIS:  Yes.
18        THE WITNESS:  I am looking at it, and there is
19   no indication here indicating I called and spoke with
20   dispatch.
21   Q.   (By Mr. Kallis):  Are you issued a cell phone
22   by the department?
23   A.   Yes.
24   Q.   And do you have a personal cell phone?
25   A.   Yes.

Page 112

1      Q.   That's correct.

2      A.   No, nothing specific to indicate that.

3      Q.   And I will go back to my question in a slightly

4   different way.

5          At that point in time if Mr. Cole had walked

6   away and just ignored you, would you have had any legal

7   justification in your mind to stop him from doing so?

8          MR. FOX:  Again, incomplete hypothetical.

9   Calls for speculation.

10         If you are able to respond, you may.

11         THE WITNESS:  Again, I -- I would be purely

12  speculative what I would have done next.

13     Q.   (By Mr. Kallis):  At that time -- taking the

14  totality of the situation that you had, at that time --

15  and you know what that was because you told us what it

16  is, at that point in time is it your belief as a trained

17  police officer that you had a basis for detaining him or

18  arresting him?

19         MR. FOX:  Compound.

20     Q.   (By Mr. Kallis):  You can answer either or

21  both.

22     A.   Um, would you ask the question again.

23         THE REPORTER:  "Question:  At that time --

24  taking the totality of the situation that you had, at

25  that time -- and you know what that was because you told

a21d93f4-5bca-4fe8-bdb0-3a137d64d9df

Paragon Reporting Services (408) 295-8301

Page 113

1   us what it is, at that point in time is it your belief

2   as a trained police officer that you had a basis for

3   detaining him or arresting him?"

4          THE WITNESS:  Um, at the time we went to make

5   contact, um, I definitely felt there was a need to

6   investigate the comment that I heard, the threat or the

7   nature of the statement, after tomorrow this will all be

8   over, or something similar to that effect that I heard.

9          I thought that that was something that would

10  definitely -- that I would, uh, need to, uh, follow up

11  on, and that's --

12     Q.  (By Mr. Kallis):  What in that comment taken

13  out of context suggests to you that a crime is or was

14  about to be committed or that someone was a danger to

15  themselves or others?

16     A.  The -- the nature of the comment to me, uh, you

17  know, was that it was, you know, possibly some sort of

18  threat.

19     Q.  Was Mr. Cole saying anything after that that

20  you heard?

21     A.  Um, I don't recall hearing anything after that.

22     Q.  Do you recall hearing anything before that?

23     A.  I don't recall.

24     Q.  Was Mr. Cole screaming at the top of his lungs?

25     A.  Um, not that I recall.

Page 114

1    Q.   Normal tone of voice?

2    A.   Um.

3         MR. FOX:   Now, is this the conversation at the

4    house or while he was at the driveway?

5         MR. KALLIS:   While he was on the driveway.

6    Q.   (By Mr. Kallis):   When you overheard the

7    comment?

8    A.   When I overheard that comment?

9    Q.   Correct.

10   A.   Yeah.   I recall being slightly louder than a

11   conversational tone that we are speaking in now because

12   I could hear it from, you know, outside of the house

13   somewhere in the driveway.

14        So -- but it definitely was not an at the top

15   of your lungs yell.

16   Q.   Would you call it screaming?

17   A.   No, I wouldn't classify it as that.

18   Q.   Would you call it yelling?

19   A.   I wouldn't classify it as that.

20   Q.   So it was loud talking?

21   A.   Yes.

22   Q.   And can you give me any estimate, I am just

23   asking for an estimate, of how long you were standing

24   there after the comment before you made contact?   Five

25   minutes?   Ten minutes?   Fifteen minutes?

a21d93f4-5bca-4fe8-bdb0-3a137d64d9df

Page 115

1    A.  Um, I -- I would -- an estimate, uh, probably
2    in the range of five minutes.
3    Q.  Now, did you make contact before or after the
4    25:03 miscellaneous entry?
5    A.  Um, this goes back to earlier.  I don't
6    specifically recall what -- at what point that
7    information was relayed to me.  But similar information,
8    that information similar to that was relayed over the
9    radio to me.
10    Q.  Is there anything in the 25:03 communications
11    that suggest to you that there is a threat or a danger?
12    A.  There is nothing specifically within that that
13    would suggest a threat.
14    Q.  Okay.  Or that someone may do imminent danger
15    to themselves or others?
16    A.  Nothing within that.
17    Q.  Okay.  So let's look at the 25:25 comment.  Do
18    you see that?
19    A.  Yes.
20    Q.  No violent history.  He is usually good with
21    the police.
22        Is there anything there that suggests to you
23    that a crime has been committed or is about to be
24    committed?
25    A.  No.

Page 135

1    Q.  Do you remember where he was?

2    A.  Specifically, no.

3    Q.  How about generally?

4    A.  Uh, I don't recall.

5    Q.  Okay.  After Mr. Cole was handcuffed, what

6    occurred?

7    A.  Um, by that time, uh -- at some point there

8    Officer -- Lieutenant Hern arrived on scene.  And I

9    informed him of the information that I had.

10   Q.  Okay.  And at this point you were convinced

11   that Mr. Cole was a 5150?

12   A.  Yes, based upon the -- the information, uh,

13   from his mother, um, my observations of him as well as

14   the, uh -- the -- the threatening comment that I heard.

15   Q.  Do you know what the -- what mental illness or

16   mental defect that Mr. Cole was suffering from that

17   would make him an imminent danger to himself or others?

18   A.  Um, I based it upon the information that his

19   mother had related, took Xanax for anxiety.

20   Q.  Okay.  So is it your belief at the time or was

21   it your belief at the time that the taking of Xanax for

22   anxiety constitutes a psychological impediment that

23   would make him an imminent danger to himself and others?

24   A.  Was, uh, not -- not that fact alone.  The

25   reason why I felt that he was a danger to others, um --

Paragon Reporting Services (408) 295-8301

Page 136

1    are you asking me -- actually how about you clarify your

2    question for me.

3        Q.   Okay.   You previously responded that you think

4    he had made something that could be construed of as a

5    threat?

6        A.   That's correct.

7        Q.   You previously responded that in terms of the

8    5150 that he was taking Xanax.   Okay?   And I am trying

9    to clarify that issue.

10       MR. KALLIS:   With that in mind, would you

11   please read back the preceding question.

12       THE REPORTER:   "Question:   So is it your belief

13   at the time or was it your belief at the time that the

14   taking of Xanax for anxiety constitutes a psychological

15   impediment that would make him an imminent danger to

16   himself and others?"

17       THE WITNESS:   Um, okay.   I believe that the

18   fact that he took Xanax for anxiety coupled with his

19   making a threatening comment to his mother, um,

20   qualified him to meet the terms, the conditions set

21   forth for 5150 of the Welfare and Institutions Code.

22       Q.   (By Mr. Kallis):   What are the diagnostic

23   criteria for anxiety?

24       MR. FOX:   I will object.   You are asking him a

25   question that he is not professionally trained to answer

Cole v. City of Sunnyvale        Steven Rocheville, March 8, 2011

a21d93f4-5bca-4fe8-bdb0-3a137d64d9df

1  in terms of psychology or psychiatry.

2       If you are asking him for his understanding

3  based upon his training and experience as a police

4  officer, you can respond to that question.

5       Q.  (By Mr. Kallis):  Well, do you have an

6  understanding of the manifestations of anxiety?

7       A.  In general terms, I believe yes.

8       Q.  What are your understandings?  What is your

9  understanding of the manifestations of anxiety?

10      A.  That in general it makes somebody, um -- you

11  know, anxieties, nervousness, um, you worry about

12  things, you know, very -- I would have to say my -- my

13  understanding would be very general.

14      Q.  Okay.  So did you have any understanding that

15  anxiety is a precursor to violent behavior?

16      A.  Anxiety in itself?

17      Q.  Yes.

18      A.  Um, not necessarily.  I -- I would say that,

19  uh, not in itself.  Not by itself.

20      Q.  Can people be upset and angry without being

21  5150?

22      A.  Yes.

23      Q.  And what differentiates someone who is upset

24  and angry and making rash statements?

25           MR. FOX:  I'm sorry, did you say irrational or

Page 148

1   would -- from what I remember.

2         MR. KALLIS:  Okay.

3         Q.  (By Mr. Kallis):  How long did you stay at the

4   car the first time you went back to your squad car to

5   make the phone call?

6         MR. FOX:  To Ms. Cole?

7         MR. KALLIS:  To Ms. Cole.

8         THE WITNESS:  I don't know exactly.  I'm sorry.

9   Could you repeat the question?

10        Q.  (By Mr. Kallis):  You left the garage?

11        A.  Yes.

12        Q.  You went to your car.  You made a three to

13  five-minute call.

14        At some point you went back to the garage; is

15  that correct?

16        A.  Yes.

17        Q.  How long were you gone?

18        A.  The same approximate time of the phone call.

19        Q.  Okay.  And the second time you went out to make

20  a phone call, how long were you gone?

21        A.  Um, I don't recall.

22        Q.  Would it have been longer than the duration of

23  the phone call by a substantial amount or just about the

24  same?

25        A.  I don't recall if I returned back to the house

Paragon Reporting Services (408) 295-8301

Page 149

1   at that time or not.

2       Q.  Okay.  So the second phone call could have been

3   made at the house?

4       A.  I -- I don't recall, um, where that second

5   phone call was made from.  Where I was standing, no.

6       Q.  Okay.  So some point of time passed, and

7   Ms. Cole came out of the house into the garage.

8           Tell me what transpired during the period of

9   time from when Mr. Cole was cuffed to the point where

10  Ms. Oberg comes out.

11          MR. FOX:  Comes out?

12          MR. KALLIS:  Of the house to the garage.

13          MR. FOX:  Thank you.

14          THE WITNESS:  Okay.  So, um, after we -- after

15  Mr. Cole was detained, um, and we learned that he lived

16  in the residence with, um, Ms. Oberg and two children,

17  um, Mr. Cole again was not -- was not answering

18  questions.

19          We were concerned for the welfare of the

20  residents.  We wanted to do a welfare check to make sure

21  everything was okay inside the house.  Um.

22      Q.  (By Mr. Kallis):  Did you have any indication

23  that anybody was not okay?  That's a double negative.

24          Was there any indication that someone was not

25  okay?

Cole v. City of Sunnyvale      Steven Rocheville, March 8, 2011

a21d93f4-5bca-4fe8-bdb0-3a137d64d9df

Page 150

1      A.   I had no direct knowledge that somebody was --

2      Q.   Did you have indirect knowledge that anybody

3   was injured?

4      A.   Um, no.

5      Q.   Were you aware of things being out of place?

6   In other words, did it look like there had been a fight

7   or things had been pushed over or turned over?

8      A.   Um, where specifically?

9      Q.   Whatever part of the house you saw.

10     A.   Okay.  Um, when we made the determination to do

11  the welfare check, we were just inside of the garage.

12  We didn't have a view inside the house.  So I -- so I

13  didn't see specifically what the house looked like.

14     Q.   Okay.  Did anybody else have a view inside the

15  house before you went to do the welfare check?

16     A.   I don't recall.  I wouldn't know.  I could

17  speak to what I could see.

18     Q.   But were the other officers with you during

19  that whole period of time?

20     A.   Yes, and I don't recall one of the other

21  officers saying whether or not they could see inside the

22  house.

23     Q.   Okay.  Did you advise Mr. Cole that you wanted

24  to do a welfare check?

25     A.   Um, I don't recall how, uh, what specifically

Page 151

1   was told to Mr. Cole.  Um, whether or not we directly

2   related to him we are going to do a welfare check or

3   whether he overheard us saying that, but I believe we

4   did discuss openly the, uh -- that we were going to do a

5   welfare check inside the house.

6       Q.   That was you, Lieutenant Hern and Officer

7   Cortese?

8       A.   Yes.

9            MR. FOX:   Please let him finish his answer

10  because he is kind of wavering a little as he is getting

11  to the end.  He is adding some information, so --

12           MR. KALLIS:   I am trying to move along.

13           MR. FOX:   I know.

14      Q.   (By Mr. Kallis):   If I cut you off, please let

15  me know you haven't finished.

16      A.   Yes.

17      Q.   I am breaking my own rules, so I apologize.

18           Tell me about this discussion you had with

19  respect to the welfare check.

20      A.   I don't know.  I don't recall specifically what

21  was said other than the -- that it was decided we would

22  go ahead and check on the occupants to make sure that

23  they were -- their safety was okay.

24      Q.   And do you know if at this point in time

25  whether your radio recording equipment was on?

a21d93f4-5bca-4fe8-bdb0-3a137d64d9df

```
 1              I, Terry deDiego, a Certified Shorthand

 2     Reporter in and for the State of California, hereby

 3     certify that the witness in the foregoing deposition,

 4                    STEVEN ROCHEVILLE,

 5     was by me duly sworn to tell the truth, the whole truth

 6     and nothing but the truth in the within-entitled cause;

 7     that the foregoing is a full, true and correct

 8     transcript of the proceedings had at the taking said

 9     deposition to the best of my ability.

10

11         DATE: March 20, 2011

12

13

14                          Terry deDiego

                            CSR License No. 8978

15

16

17

18

19

20

21

22

23

24

25
                                                        162
```

# Exhibit B

Paragon Reporting Services (408) 295-8301

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RUSSELL COLE and STEPHANIE )
OBERG, )
                                        )
        Plaintiffs,                     )
                                        )   CASE NO: C08-05017 RMW
    vs.                                 )
                                        )
SUNNYVALE, CHIEF DON JOHNSON,           )
OFFICER STEVEN ROCHEVILLE,              )
LIEUTENANT TRACY HERN,                  )
OFFICER SCOTT CORTESE, and              )
CAPTAIN KELLY FITZGERALD,               )
                                        )
        Defendants.                     )
_____)

DEPOSITION OF TRACY HERN

VOLUME I (Page 1-132)

Date:          Wednesday, March 16, 2011

Time:          9:51 a.m.

Location:      THE LAW FIRM OF KALLIS & ASSOCIATES
               333 W. San Carlos
               Suite 800
               San Jose, CA 95112

Reported by:   MECHELLE S. GONZALEZ

               Certified Shorthand Reporter

               License No. 13250

Cole v. Sunnyvale                    Tracy Hern, March 16, 2011

1438ea75-97fb-4927-b22a-adee8d91ddf6

Paragon Reporting Services (408) 295-8301

Page 124

1    correct?

2        A.   Yes.

3        Q.   So what is the basis for your belief that you

4    had authority to search the Cole residence without a

5    warrant at that time?

6        A.   Prior to the search for the weapons was

7    conducted, I clarified with Officer Rocheville if

8    Mr. Cole was, in fact, detained for a 5150, which he did

9    say yes, he was.  Maybe not in as many words, but he

10   said yes, he's detained for 5150 and would be going to

11   Valley Medical Center.

12           With 5150 comes into play our policy in the

13   section of 8102 of the Welfare Intuitions Code where our

14   policy says any person who is detained under 5150 to be

15   seen or brought to medical attention that the officer

16   shall make every effort to locate weapons and confiscate

17   those weapons per 8102.

18           MR. FOX:  8102 of the --

19           THE WITNESS:  Welfare and Institutions Code.

20           MR. FOX:  Thank you.

21           BY MR. KALLIS:  Q.  Let's take a look at the

22   policy which has already been marked Exhibit 28.  Please

23   turn to page 2 of it.

24           Is that the policy you're referring to?

25       A.   Yes, it is.

Cole v. Sunnyvale              Tracy Hern, March 16, 2011

1438ea75-97fb-4927-b22a-adee8d91ddf6

Paragon Reporting Services (408) 295-8301

Page 125

1      Q.   Do you see in there where it says "every
2   effort"?
3      A.   I do not see those words.
4      Q.   Do you see words in your policy that says that
5   you are allowed to do that without a warrant?
6      A.   I do not see that in the policy.
7      Q.   Do you see anywhere in the policy where it says
8   that you must immediately search the home?
9      A.   I don't see that, no.
10     Q.   Is there any other policy that you're aware of
11  that was in effect at that time the Sunnyvale Police
12  Department that was included in or part of the policy
13  for 5150s and 8102s?
14     A.   I don't believe so.
15     Q.   On what basis did you believe that the
16  immediate search of the home was authorized?
17     A.   As part of our thorough investigation, and to
18  ensure the safety of Mr. Cole and any other persons in
19  the house, my belief is that we would have to do the
20  search to confiscate any weapons that we believed were
21  there or we knew were there for a fact.
22     Q.   Did you know for a fact that there were weapons
23  there?
24     A.   No, we did not.
25     Q.   Let me see if I have this straight.  Mr. Cole

Cole v. Sunnyvale                    Tracy Hern, March 16, 2011

Paragon Reporting Services (408) 295-8301

Page 126

1   is in handcuffs with officers around him and/or about to

2   be transported to Valley Medical; is that correct?

3       A.   Yes, sir.

4       Q.   He has no way at this point of getting to any

5   of those guns, did he?

6       A.   Not at that point.

7       Q.   So if there were guns in the house at that

8   point, they were a danger -- as far as Mr. Cole is

9   concerned, they weren't a danger to anybody, were they?

10      A.   At that moment, no.

11      Q.   Now, if you will be kind enough to look at

12  8102.  Actually this is a current version, so let's not

13  do that.

14          Is there anything that made you believe that

15  you had a right to search then as a result of the a

16  cumulative danger other than what you have already

17  expressed?  Is there any code that gave you that right?

18          MR. FOX:  Other than what he's described.

19          MR. KALLIS:  Yes.

20          MR. FOX:  Thank you.

21          THE WITNESS:  Other than what I've described,

22  no.

23          BY MR. KALLIS:  Q.  Did you feel that under

24  5150 and 8102 that it was necessary at that point to

25  search the house?

Cole v. Sunnyvale                    Tracy Hern, March 16, 2011

1438ea75-97fb-4927-b22a-adee8d91ddf6

Page 127

1      A.   Coupled with our policy, yes, I did.

2      Q.   So that was the policy of the Sunnyvale Police

3  Department or public safety to do that?

4      A.   To confiscate any weapons.

5      Q.   No.  To search as soon as the person had been

6  determined to be a 5150?

7      A.   That was standard operating procedures, yes.

8      Q.   And are you aware of any section of 5150 that

9  changes the requirements to follow the warrant laws?

10     A.   I don't have any direct knowledge of any

11  changes to 5150.

12     Q.   Or anything in 5150.  I'm talking about not

13  only that one section, but I'm talking about the whole

14  5150 section of the Welfare Institutions.

15     A.   Without looking at it I wouldn't be able to

16  tell you.

17     Q.   And have you been trained on how to seek a

18  warrant?

19     A.   Yes, I was.

20     Q.   And have you in the past received warrants that

21  you applied for?

22     A.   Search warrants?  Arrest warrants?

23     Q.   Let's call search warrants.

24     A.   Search warrants, I have not ever applied for a

25  search warrant.

Paragon Reporting Services (408) 295-8301

Page 128

1      Q.   Do you know how to?

2      A.   I know how to, yes.

3      Q.   Is there a method for getting a search warrant

4   in the middle of the night?

5      A.   There is guidelines and policies that we have

6   in place and a protocol to follow.

7      Q.   So you can get a search warrant in the middle

8   of the night?

9      A.   Yes.

10     Q.   Could you have gotten a search warrant to

11  search Mr. Cole's residence?

12         MR. FOX:  Calls for speculation.

13         MR. KALLIS:  No.  Could he have gotten one.

14         MR. FOX:  You mean physically obtain the

15  warrant?

16         MR. KALLIS:  Going through the procedures to

17  get the warrant.

18         MR. FOX:  If you're asking him if he could

19  perform the procedures, that's one thing.  Whether or

20  not a judge is available is something else.

21         BY MR. KALLIS:  Q.   Could you have gone through

22  the procedures to get the warrant?

23     A.   I could have, yes.

24     Q.   And how long do you believe it would take to

25  get a telephonic warrant?

Cole v. Sunnyvale                    Tracy Hern, March 16, 2011

1438ea75-97fb-4927-b22a-adee8d91ddf6

Page 129

1      A.  For this case or in general?

2      Q.  In general.

3      A.  I have no idea.

4      Q.  How about a telephonic arrest warrant?  Have

5  you done that?

6      A.  I have not done that.

7      Q.  Do you think you could have gotten a search

8  warrant for the Cole residence within a few hours?

9          MR. FOX:  Question is vague as to "few hours."

10         THE WITNESS:  Between midnight and four o'clock

11  in the morning?

12         MR. KALLIS:  That's more than a few, but sure

13  I'll go with midnight to four.

14         THE WITNESS:  My personal belief is that a

15  judge would not have granted a search warrant for this

16  particular incident because of the facts in the case at

17  that time.

18         BY MR. KALLIS:  Q.  So you didn't think you

19  could get a search warrant?

20     A.  At that time a search warrant was not required.

21  Under the 5150 to 8102 and the policy in general for

22  getting or confiscating the weapons, I understand that

23  there has been a change with the Supreme Court ruling,

24  which now it is necessary for the search warrant.

25     Q.  Well, we're interested in what existed at that

1438ea75-97fb-4927-b22a-adee8d91ddf6

Paragon Reporting Services (408) 295-8301

Page 130

1  time.

2      A.  Okay.

3      Q.  And actually it was an appellate court ruling

4  that was appealed to the Supreme Court, and prior to the

5  Supreme Court making its decision, the state legislature

6  changed the law so it's clear.  A judge had found that

7  it was always clear that a warrant was required, but be

8  that as it may --

9          MR. FOX:  Just for the record, in terms of what

10  the judge may or may not have said, and what he thought

11  was clear, or always had been clear, I'm going to object

12  to your characterization.

13          MR. KALLIS:  Okay.  That's fine.  The case

14  speaks for itself even though it was depublished.

15          I have to go.  We'll set up another date to

16  continue this wonderful interaction hopefully --

17          MR. FOX:  With exhibits.

18          MR. KALLIS:  With exhibits.

19          MR. FOX:  Do you want to set the date right

20  now?

21          MR. KALLIS:  We will get it done.  Thank you

22  very much.

23          MR. FOX:  I would like a full copy of the

24  transcript.  Full order.

25                        //

Cole v. Sunnyvale                    Tracy Hern, March 16, 2011

1438ea75-97fb-4927-b22a-adee8d91ddf6

1         I, MECHELLE S. GONZALEZ, a Certified Shorthand

2 Reporter in and for the State of California, hereby

3 certify that the witness in the foregoing deposition,

4                  TRACY HERN,

5 was by me duly sworn to tell the truth, the whole truth

6 and nothing but the truth in the within-entitled cause;

7 that the foregoing is a full, true and correct

8 transcript of the proceedings had at the taking said

9 deposition to the best of my ability.

10

11     DATE: March 16, 2011

12

13 _____

14     MECHELLE S. GONZALEZ

       CSR License No. 13250

15

16

17

18         Upon completion of the foregoing transcript,

19 the witness was notified it was ready for signature, but

20 the deposition was not signed by the witness for the

21 following reason:

22 _____

23 _____

24 _____

25 _____

                               132

# Exhibit C

Paragon Reporting Services (408) 295-8301

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RUSSELL COLE, an individual; and
STEPHANIE OBERG, an individual,
        Plaintiffs,

        vs.                              No. C-08-05017 PVT

CITY OF SUNNYVALE, a municipal
corporation within the State of
California; BUREAU OF POLICE CHIEF
DON JOHNSON, in his individual and
official capacity; BUREAU OF
POLICE CAPTAIN KELLY FITZGERALD,
in his individual and official
capacity; BUREAU OF POLICE
LIEUTENANT TRACY HERN, in his
individual and official capacity;
BUREAU OF POLICE OFFICER STEVEN
ROCHEVILLE, in his individual and
official capacity; BUREAU OF
POLICE OFFICER SCOTT CORTESE, in
his individual and official
capacity; and DOES 1 through 10,
        Defendants.
_____/

DEPOSITION OF SCOTT CORTESE

Date:        Thursday, March 31, 2011

Time:        9:38 a.m.

Location:    BUSTAMANTE, O'HARA & GAGLIASSO, P.C.
             333 West San Carlos Street
             8th Floor
             San Jose, CA 95110

Reported by:  TERRY deDIEGO
              Certified Shorthand Reporter
              License No. 8978

Page 50

1        MR. STEARNS:  Do you want to take a break?

2        THE WITNESS:  Sure.

3        MR. STEARNS:  Going through a lengthy process.

4  Sure.

5        (Recess taken.)

6        MR. STEARNS:  Back on the record.

7     Q.  (By Mr. Stearns):  Before we go a little bit

8  further, I want to verify when you showed up at the call

9  for this incident, you were in full uniform; correct?

10     A.  Correct.

11     Q.  Duty belt and everything; right?

12     A.  Absolutely.

13     Q.  At any point in time while you were on the

14  premises, did you ever widen the opening of the garage

15  door?

16     A.  No.

17     Q.  Did you ever see anyone else widen the opening

18  of the garage door, including Mr. Cole?

19     A.  No.

20     Q.  So just that initial opening, that was the

21  extent of it?

22     A.  Correct.

23     Q.  After dispatch advised you that there were

24  other people inside the house, did you and Officer

25  Rocheville confer at all as to doing a welfare check on

Paragon Reporting Services (408) 295-8301

Page 51

1    the individuals in the house?

2         A.   Confer, no.

3         Q.   Okay.  At the time that -- strike that.

4              Prior to learning that there were other

5    individuals in the house, had Officer or Lieutenant Hern

6    arrived on the scene?

7         A.   Um, don't recall exactly when he arrived and

8    when we found that information out.  I don't believe he

9    was yet, but I don't know.

10        Q.   At the time that you arrived on the scene, the

11   subtotal of information that you had about this

12   situation was what is in the CAD report which we marked

13   as Exhibit 16 up until that point in time which you said

14   is more likely between 011 and 015; correct?

15        A.   Correct.

16        Q.   And at the time that you arrived on the scene,

17   there is nothing in the CAD report indicating that

18   anyone in the house was hurt; correct?

19        A.   Correct.

20        Q.   As far as being able to look into that front

21   window into the house, you didn't see what looked like

22   any hurt individuals; correct?

23        A.   Correct.

24        Q.   When you saw Mr. Cole through that front

25   window, he did not appear to be hurt, did he?

Page 52

1    A.   Correct.

2    Q.   Prior to going to the garage, you also had no

3    indication that anyone in the house was in need of any

4    kind of medical attention; correct?

5    A.   That's an assumption.  I don't know what's in

6    there.  I can only see the doorway in the kitchen area

7    where it was lit.  The rest of the house was all to the

8    left, and there was a hallway and bedrooms we could not

9    see into.

10    Q.   Correct.  That was the focus of the question.

11         You had no indication, you had no information

12    telling you that anybody in the house needed medical

13    attention at that point in time; correct?

14    A.   There was nothing I saw that indicated that.

15    Q.   And there was nothing you had heard from any

16    other source that indicated that either?

17    A.   Correct.

18    Q.   Again, based on the information you had

19    available to you at the time you arrived at the house,

20    there was no information indicating that Mr. Cole had

21    committed a crime at the time you arrived at the house;

22    correct?

23    A.   Correct.

24    Q.   How long were you and Officer Rocheville in the

25    garage with Mr. Cole prior to any officer going into the

Page 53

1    house?

2         A.   I would say an estimation of about 10 to

3    15 minutes at the most.

4         Q.   During that 10- to 15-minute period when you

5    were just in the garage, did you gain any additional

6    information as to the condition of the occupants of the

7    house or anything that had happened in the house?

8         A.   Sorry.  Clarify that.

9         Q.   Sure.  During that time period you learned

10   there were other occupants in the house?

11        A.   Correct.

12        Q.   Okay.  So let's start there.

13        During that 10- to 15-minute time period, did

14   you gain any additional information to determine if the

15   people who resided in the house were actually present in

16   the house?

17        A.   Um, Mr. Cole had said that there was his

18   girlfriend in the house.  I don't remember if he

19   mentioned the kids, but he did say there was a

20   girlfriend in the house.  He confirmed that.

21        Q.   Did you have any other information that you

22   gained during this 10- to 15-minute time period about

23   the condition of the individuals in the house, whether

24   they were hurt?

25        A.   No.  He became defensive when we asked him

Paragon Reporting Services (408) 295-8301

Page 77

1      Q.   (By Mr. Stearns):   Or in the garage.

2      A.   Did we talk about it, no.

3      Q.   At this point in time did you and Lieutenant

4  Hern talk about having Ms. Oberg come out to the garage

5  to speak to Mr. Cole?

6      A.   I don't recall.   I don't think so.

7      Q.   I believe I skipped this, too.

8           At the time you went into the house, was

9  Mr. Cole already handcuffed?

10     A.   Yes.

11     Q.   Who handcuffed Mr. Cole?

12     A.   Officer Rocheville.

13     Q.   Prior to Mr. Cole being handcuffed, did you and

14 Officer Rocheville talk about handcuffing him?

15     A.   Talk about it, no.

16     Q.   What is your understanding of the reason why

17 Mr. Cole was handcuffed?

18     A.   He was being detained.

19     Q.   Why was he being detained?

20     A.   Possible 5150, and then we needed to

21 investigate the possible 422 threats.

22     Q.   What is your understanding of the requirements

23 to detain someone under a 5150?

24     A.   For the detention as far as taking them to

25 emergency psychiatric or just detaining them in

Cole v. City of Sunnyvale       Scott Cortese, March 31, 2011

322cb666-b249-47d8-a752-d1677861794f

Paragon Reporting Services (408) 295-8301

Page 78

1    handcuffs until we can establish more information?

2         Q.  My understanding from your testimony is you

3    detained him for a possible 5150.

4         A.  Officer Rocheville.

5         Q.  Officer Rocheville.  I am talking about in

6    general what are the requirements to do that type of

7    retention.  That's the only time I am talking about

8    anymore.

9         A.  5150 Code says the person is a danger to

10   themselves or others or disabled.

11        Q.  As far as prior to Mr. Cole being handcuffed

12   and detained, what did you perceive as being a --

13   Mr. Cole being a danger to himself?

14        A.  To himself?

15        Q.  Yes.

16        A.  No.

17        Q.  As far as the same time period prior to him

18   being detained possible 5150, what did you perceive as

19   Mr. Cole being a danger to others?

20        A.  The comment that he made that this would be

21   over.  His angry mannerism.  The way that he shut down,

22   went into this catatonic stare.  His actions were not of

23   a normal person that we deal with on a day-to-day basis.

24            We contact people every day all day long.  And

25   when somebody is slightly imbalanced as far as mentally,

Cole v. City of Sunnyvale          Scott Cortese, March 31, 2011

322cb666-b249-47d8-a752-d1677861794f

Paragon Reporting Services (408) 295-8301

Page 79

1    you can get a gauge of that.

2          We are not experts, but when you deal with

3    enough people every day, you kind of get a sense of what

4    people in a normal setting do.  Especially at nighttime.

5          Q.  So at the point in time when he was detained,

6    you had already formed the opinion that he was slightly

7    imbalanced, I think that's the phrase you used?

8          A.  Correct.

9          Q.  You mentioned a number of things.  You said

10   catatonic stare.  Shut down.  Are those things that you

11   are relying upon for making a determination that you

12   thought he was slightly imbalanced at that point in

13   time?

14         A.  Yes.  Part of my thinking.

15             MR. FOX:  In case you need it.

16             THE WITNESS:  Allergies.

17             MR. FOX:  All right.

18             THE WITNESS:  Thanks, though.

19         Q.  (By Mr. Stearns):  When you say "shut down,"

20   describe for me what you are referring to.

21         A.  He was answering our questions, um, and then

22   suddenly he just stopped talking, stopped responding,

23   stopped acknowledging, and just stared straight ahead

24   deep breathing as if he was upset.  And refused to

25   communicate with us in any way, shape or form.

Cole v. City of Sunnyvale          Scott Cortese, March 31, 2011

322cb666-b249-47d8-a752-d1677861794f

```
 1              I, Terry deDiego, a Certified Shorthand

 2    Reporter in and for the State of California, hereby

 3    certify that the witness in the foregoing deposition,

 4                    SCOTT CORTESE,

 5    was by me duly sworn to tell the truth, the whole truth

 6    and nothing but the truth in the within-entitled cause;

 7    that the foregoing is a full, true and correct

 8    transcript of the proceedings had at the taking said

 9    deposition to the best of my ability.

10

11         DATE: April 4, 2011

12

13                     _____

14                     Terry deDiego

                       CSR License No. 8978

15

16

17

18

19

20

21

22

23

24

25
                                                    119
```